# Peet & Co. v. Hatcher.

*Bill in Equity to foreclose a Mortgage.*

1. *Validity of contract; by what law determined.*—The force and validity of a contract is determined by the law of the State where the acts and transactions are contemplated to be performed.

2. *Presumption as to existence of common law in another State; not indulged as to Louisiana.*—The common law is presumed to prevail in States having a common origin with our own, or populated by citizens coming from States having such common origin; and the State of Louisiana, not having a common origin with our own, and not populated by citizens from States having such common origin, the common law is not presumed to exist there.

3. *Same; when indulged.*—Where there is no proof of the law of another State, nor judicial knowledge of the origin of such State, which would raise the presumption that the common law prevails there, it will be presumed that the law of the forum is the law of such State on the question under consideration.

4. *What law enforced in the absence of presumption and proof of foreign law.*—When a contract made in another State or country, wherein we can not presume the common law exists, is sought to be enforced in this State, and the *lex loci contractus* is not produced or proven, the law of this State will be applied, even though it be statutory.

5. *Contracts; governed by law of the State wherein made and to be performed.*—When a contract is both made and is to be performed in the same State, the law of that State, in the absence of a qualifying element, will govern its nature, obligation and interpretation.

6. *Statutes and laws of other States; when not sufficiently shown to authorize their consideration on appeal.*—The Supreme Court of this State will not look into the Code or Supreme Court reports of another State to ascertain what the law of that State is, unless the sections of the Code or the opinion in the reports referred to are set out in the bill of exceptions, or are properly presented by the transcript before the court on appeal; and when in a chancery suit seeking to enforce a contract made in the State of Georgia, the note of submission states that the case was submitted, among other data, upon a certain section of the Code of Georgia and certain decisions of that State as contained in designated volumes of the Supreme Court reports, but neither the

[Peet & Co. v. Hatcher.]

section of the Code nor the decisions referred to are set out in the transcript, they can not be considered as evidence, nor will the court look into the Code of Georgia or the designated volumes of the reports for the purpose of ascertaining what they contain as to the question being considered.

7. *Future contracts; advances made by broker recoverable.*—Under the common law, contracts founded upon gambling considerations, such as dealing in cotton futures, are void; but where contracts for the purchase and sale of cotton futures are made by a broker who has no interest in the contracts except to realize his commissions, which are payable in any event, and such broker makes advances upon the contracts, the principal is bound at common law to reimburse the broker for advances made for him, if he subsequently executes his note or bill therefor, or makes a promise to pay them, or with full knowledge of the fact permits the transactions to proceed, without objection; and, in the absence of a statute denouncing such future contracts as illegal and void, such obligation of the principal can be enforced by the broker.

8. *Same; enforced here if valid in State where it is to be performed, although void and violative of public policy of this State.*—A contract in the purchase and sale of cotton futures made and to be performed in another State, and which is valid and enforceable in that State, will, by reason of the comity existing between the States, be given validity and enforced in this State, although such contract is positively forbidden by the statutes and is contrary to the public policy of this State.

9. *Res judicata; judgment on an account conclusive of the validity of the consideration of a note given therefor.*—Where a note is given to close an account, the note and the account are cumulative evidence of the same debt; and if the account is sued on, a recovery thereon establishes the validity of its consideration, and is conclusive of the validity of the consideration of the note; and in a subsequent suit in equity to foreclose a mortgage given to secure said note, the question of the validity of its consideration is *res judicata*, and no other or further defenses as to the validity of the debt can be made than could be made if the equity suit were an action at law upon the same debt.

10. *Gaming contracts; judgment thereon precludes inquiry by court of equity into the consideration.*—At common law, and under the law of this State, a recovery upon a gambling contract establishes the validity of the consideration of the contract as between the parties to the action, and precludes inquiry into the consideration by a court of equity, without showing some reason or excuse why the defense was not made at law.

11. *Judgments; conclusiveness of a recovery upon a judgment in another State.*—Under the constitution and laws of the United States, a judgment or decree rendered in one State has the same effect and is as conclusive in any other State, where it may come in controversy, as it has and is in the State where rendered; and where a judgment

was obtained in the State of New York upon a contract founded upon a gaming consideration, and such judgment was afterwards sued upon and a recovery had in the State of Georgia, in a court having jurisdiction of the person of defendant and the subject matter of the suit, such latter judgment is conclusive of the validity of the consideration of the New York judgment, and is enforceable in this State, although by the statute of New York judgments obtained upon a debt infected with a gambling consideration are void, and in any proceeding seeking their enforcement will be annulled by proof of the nature of the consideration. This is true because it was open to the defendant in the Georgia court to plead and prove the nature of the consideration of the New York judgment, and his failure to do so cut off all further inquiry into its validity, and the recovery became conclusive of the debt.

APPEAL from the Chancery Court of Russell.

Heard before the Hon. JOHN A. FOSTER.

The bill in this case was filed by the appellants against the appellees, to foreclose a mortgage. The facts of the case are sufficiently stated in the opinion.

On the final submission of the cause on the pleadings and proof, the chancellor decreed that the complainants were not entitled to the relief prayed for, and ordered the bill dismissed. From this decree the complainants appeal, and assign the rendition thereof as error.

NORMAN & SON, for appellants.

THORINGTON & CHILTON, PEABODY, BRANNON & HATCHER and J. W. FOSTER, *contra.*—1. The consideration of the note and mortgage was void. It was an independent transaction with C. P. Ellis; being given to him, the payee, for his draft for an equal sum, which was never paid and for which Hatcher never received any credit. The fact that it was not paid and that Hatcher never received credit therefor is beyond controversy. The doctrine that a mortgage only secures the debt intended by the parties to be secured is well settled. *Edwards v. Dwight*, 68 Ala. 389; *Bradford v. Bradford*, 66 Ala. 255; *Bolling v. Jones*, 67 Ala. 508; *Chapman v. Lee*, 64 Ala. 483; *Hannon v. Hannon*, 123 Mass. 441.

2. The contract must be governed by the law of the place where it was to be performed. When the place of making the contract is also the place where it is to be performed, there can be no question as to the law by which

[Peet & Co. v. Hatcher.]

its effect and validity is to be determined.—Rorer on Inter-State Law, pp. 60, 61, note 1.

3. The question is, not whether the sales of cotton futures are valid in Louisiana, but whether they are valid by the laws of Georgia, where the contract of indemnity "was made and was to be performed."—Code of Georgia, § 2638; Nat. Bank v. Cunningham, 75 Ga. 366.

4. Under the laws of Georgia, the contract was void. Being void as opposed to good morals and public policy of that State, the courts of Alabama would not enforce it, even if valid here. But it is void here for the additional reason that it is also opposed to our own statutes and public policy. In Lee v. Boyd, 86 Ala. 283, such transactions were denounced as "reprobated by the law and void for illegality." The comity of a State will never be extended to the enforcement in its courts of contracts opposed to good morals or public policy as declared in its statutes, or judicial decisions, even though such contract be valid where made.—Code of 1886, §§ 1744-1748; Hanrick v. Andrews, 9 Port. 9; Story on Conflict of Laws, § 259; Davis v. Bronson, 6 Iowa 410; Cubbedge v. Napier, 62 Ala. 518; Falls v. U. S. S. L. & B. Co., 97 Ala. 417.

5. In the absence of allegations and proof by the complainant showing that the laws of Louisiana are different, on the subject of wagering contracts, from the laws of Alabama, this case must be decided according to the law of this State.—Peabody v. Maguire, 70 Me. 572; Conolly v. Riley, 25 Md. 402; Hadley v. Gregory, 57 Iowa 157; Chapin v. Dobson, 78 N. Y. 74; Hynes v. McDermott, 82 N. Y. 41; Rogers v. Hatch, 8 Nev. 35; Silver v. K. C., St. L. &. C. R. R. Co., 21 Mo. App. 5; Monroe v. Douglas, 1 Selden 452; Allen v. Watson, 2 Hill (S. C.) 319; Norris v. Harris, 15 Cal. 253. By our law such contracts are, of course, invalid.—Code of 1886, §§ 1744-1748; Hawley v. Bibb, 69 Ala. 52; Lee v. Boyd, 86 Ala. 283, and cases cited.

6. The doctrine of res judicata does not prevent the defendant from impeaching the validity of the judgment recovered against him in New York, and also the judgment recovered in the State of Georgia.—2 Black on Judgments, § 379; Woodson v. Barrett, 2 Hen. & M. 86; Skipwith v. Strother, 3 Rand. 214; Fenno v. Sayre, 3 Ala. 477; Paine v. Ins. Co., 11 R. I. 411; Rae v. Hulbert, 17

[Peet & Co. v. Hatcher.]

Ill. 572 ; *Butcher v. Bank*, 2 Kan. 70 ; *Carpenter v. Dexter*, 8 Wall. 513 ; *Roberts v. Taylor*, 8 Port. 351 ; *Wood v. Duncan*, 9 Port. 227 ; *Samuels v. Ainsworth*, 13 Ala. 366 ; *Manning v. Manning*, 8 Ala. 138.

7. The appellants have never reduced their New York judgment to judgment in this State, and they are not seeking by their bill to collect or enforce the same. If their bill was to collect or enforce said judgment, they would not stand before the court as judgment creditors, but as general creditors only. A judgment creditor who proceeds in equity in another State to enforce the judgment occupies there the position of a general creditor at large only, and not of a judgment creditor.—*Saffold v. Wade*, 51 Ala. 214 ; 12 Am. & Eng. Encyc. of Law, p. 148, and authorities cited.

8. The bill is to enforce the mortgage, and the foreign judgment is only referred to as evidence by the force of which appellants hope to prevent an inquiry into the consideration of the demand sought to be enforced. Under these circumstances the burden is upon them to show that their judgment is exactly what they say it is, and that their demand, which they seek to enforce, is embraced therein.—*Hanley v. Donoghue*, 116 U. S. 1, also 277 ; *C. & A. R. R. Co. v. Ferry Co.*, 119 U. S. 615. Upon this issue the testimony is against them. Even if appellants were proceeding upon their judgment, and seeking to enforce it, it could be impeached and inquired into upon the theory that it was based upon a gaming contract or consideration. A party may be relieved in chancery against a judgment recovered upon a gaming contract without showing any reason for not making the defense at law.—7 Wait's Actions and Defenses, p. 87 ; *Fenno v. Sayre*, 3 Ala. 458 ; *Finn v. Barkley*, 15 Ala. 626 ; *Cheatham v. Young*, 5 Ala. 353. A contract by which the party was "neither to actually buy nor sell cotton nor to receive or deliver it, but simply to stake margins to cover differences in price, and on final settlement, merely to receive or pay the difference between the contract price and the market price at the time fixed by the contract for delivery," is offensive to the common law and void.—*Hawley v. Bibb*, 69 Ala. 52.

HEAD, J.—This is a bill filed by the appellants to foreclose a mortgage executed by the appellee, B. T.

Hatcher, and his wife, to one C. P. Ellis, on the 26th day of June, 1885, on certain lands therein described, situate in Russell county, Ala., to secure a note executed by him to the said Ellis, in the sum of ten thousand dollars, payable on the first day of November, 1885. In the fall of 1883, the complainants, Peet & Co., were cotton brokers in the city of New Orleans, engaged in buying and selling cotton futures, for customers, on the New Orleans Cotton Exchange, of which they were members. They operated for stipulated commissions of so much per bale, and made advances for their customers, to keep up their contracts, when so agreed upon. Said C. P. Ellis was then the agent of Peet & Co. Respondent, B. T. Hatcher, was a cotton warehouseman, residing and doing business in the city of Columbus, Georgia. At the time mentioned, fall of 1883, Ellis and Hatcher met in Columbus and an arrangement was made between them, by which Peet & Co. were to buy cotton futures for Hatcher in New Orleans, and make advances for him when necessary to keep up his contracts. Accordingly, the purchases began, and continued until the latter part of 1885. When the note and mortgage in controversy were executed, June 26, 1885, if the then existing contracts had been closed, Hatcher was largely in arrrears to Peet & Co., for commissions and advances; and he being about to depart for Europe, on an extended business trip, Peet & Co. desired security for the present arrearages, and to cover future losses which might develop during his absence in Europe—a continuation of the business of buying being contemplated. Ellis visited Columbus to attend to the matter, and, thereupon this note and mortgage were executed to afford the desired security. The note was at once endorsed by Ellis, and, with the mortgage, was delivered by him to Peet & Co., on his return to New Orleans. The business relations between the parties continued, as we have said, until the latter part of the year 1885, when it was ascertained that Hatcher's indebtedness amounted to over $17,000.

It is attempted to be maintained, as a defense to the present bill, that the execution of the note and mortgage was a private transaction between Hatcher and Ellis, had upon consideration of a personal loan of ten thousand dollars then made by Ellis to the former, in

the shape of a check for that sum drawn by Ellis in Hatcher's favor, on Peet & Co., which it was agreed by Ellis that Peet & Co. would honor and place the amount to his, Hatcher's, credit on their books; that the check was given and forwarded to Peet & Co., who failed to give credit for the amount; wherefore, it is contended that the consideration of the note and mortgage failed. This defense finds no satisfactory support in the evidence. It is shown to our entire satisfaction, that the use of Ellis' name in the papers, and the drawing of the check by him, were suggested, either by Ellis or Hatcher, (whose respective accounts of the matter are given in their depositions), and were observed as a mere form. Hatcher's account is, substantially, that Ellis suggested it to conceal the gambling nature of the transaction. Ellis says Hatcher suggested it to prevent injury to his credit, he supposing that such injury might follow a general public knowledge that he was dealing so largely in cotton speculations, which fact would be indicated by the use of the names of New Orleans cotton brokers. It is immaterial to determine which of these versions is the correct one, for the result is the same under either. The evidence leaves no reasonable doubt that there was, at the time, no thought or intention, on the part of either, of a personal loan of $10,000, or any other sum, by Ellis to Hatcher, but that the securities were executed for the sole use and benefit of Peet & Co., upon the consideration we have stated. We would reach this conclusion upon the answers to the bill and testimony of Hatcher alone.

The defense mainly relied on, is that the dealings between Hatcher and Peet & Co. were gambling transactions, such as the courts will not enforce. It is pleaded and insisted that those transactions were governed by the laws of Georgia, where the arrangement, under which they were had, was entered into by Hatcher and Ellis, the latter acting for Peet & Co., by force of which laws the contracts made, in the purchase of cotton, were wagers and void. It is settled by the decision of this court in *Hawley v. Bibb*, 69 Ala. 52, in a case precisely like the present, except that the dealings were on the New York, instead of the New Orleans Exchange, that the contract under which the cotton dealings were to be had, as to its validity, was governed by the laws of the

State wherein it was to be performed—in that case, the State of New York; and as the statutes of that State were not pleaded and introduced, it was held that the validity of the contract was to be determed by the principles of the common law, which were presumed to obtain in the State of New York. But we do not presume the existence of the common law in the State of Louisiana. It is only those States having a common origin with our own, or populated by citizens coming from States having such common origin, that the presumption of the existence of the common law therein, obtains here.—1 Brick Dig., 349, § 9; 3 Brick Dig., 122, § 1; *Drake v. Glover*, 30 Ala. 382. Louisiana is not one of those States.—*Castleman v. Jeffries*, 60 Ala. 380; *Norris v. Harris*, 15 Cal. 226. There is, in the present record, no pleading or proof bringing before us any local law of Louisiana. In this state of the case, following the intimations of the court in *Castleman v. Jeffries*, 60 Ala. 380, section 3 of the opinion; *W. U. Tel. Co. v. Way*, 83 Ala. 542, section 16 of the opinion, and *Drake v. Glover*, 30 Ala. 382, we held, in the former opinion, delivered in this cause, in substance and effect, that whatever the law of Louisiana might be, in the absence of pleading and proof to the contrary, contracts made there would be presumed to be lawful, and being so, under the influence of *Hawley v. Bibb, supra*, they furnished a valid consideration of a contract made and to be performed in another State, to-wit, in the State of Georgia. There was no local law of Georgia before us altering the principles of *Hawley v. Bibb*. Since our former decision, however the case of *Kennebrew v. Southern Automatic, &c., Machine Co.*, 106 Ala. 377, came under our consideration. It was an action for the price of a machine sold the defendant, in Louisiana. The question was whether there was an implied warranty that the machine was suitable for the purposes for which it was sold. The law of Louisiana was not introduced. Declaring what was said to the contrary, in *Castleman v. Jeffries, supra*, to be *dictum*, opposed to the overwhelming weight of authority, we said that it is "almost universally held that where there is no proof of the law of another State, nor judicial knowledge of the origin of such State which would raise up a presumption that the common law prevails there, it will be presumed that the

law of the forum in which the issue is being tried, is the law of that State, on the question under consideration." We cited many authorities in support of the principle. The law touching implication of warranty in such a sale, as we understood it to obtain in Alabama, was applied to the sale in question. We still think that decision is sound and supported by the weight of authority, and we adhere to it. It will be applied though our law be statutory. It may be well said, that, as we judicially know no other law of the case than our own, the parties litigant, by failing to produce the *lex loci contractus*, impliedly agree that it is the same as the *lex fori*, be the latter common law or statute. Thus, it may be regarded as settled, in this State, that when a contract made in a a State or country wherein we cannot presume the existence of the common law, is sought to be enforced in the courts of this State, and the *lex loci* is not produced, we will apply to it our own law.

But, in the present case, there is yet the distinguishing characteristic, which, in the view we at first took of the case, we did not consider it necessary to discuss, that the cotton contracts made in New Orleans, and here assailed as wagers, are not sought directly to be enforced. They were not even contracts entered into by and between the parties litigant, but money paid and services rendered by the complainants as the retained brokers of the respondent, who now assails them, in the creation and furtherance of the contracts, form the consideration of the promissory note which was made by the respondent to the complainants, *in the State of Georgia*, by its terms payable at a designated bank *in the* State of Georgia, and which is now sought to be enforced by the foreclosure of the mortgage given to secure it, executed in Georgia, upon lands situate in this State. The questions then arise, is the obligation of the note and mortgage governed by the law of Georgia? If so, what is that law, and what its effect upon a note founded upon such a consideration, assuming that the cotton contracts were, in fact, wagers? If valid and enforceable under the laws of that State, will comity permit the application of those laws to be affected by our statute which renders void all contracts founded upon gambling considerations, and authorizes recoveries of all moneys, &c., paid there-

on, when the note and mortgage are sought to be enforced in our courts?

1. We deem it unnecessary to discuss the axiom that, in the absence of a qualifying element, when a contract is both made and to be performed in the same State, the law of that State will govern its nature, obligation and interpretation. This rule determines that the law of Georgia governs the present note; and, considered as a security merely, the mortgage.

2. What is that law? We are not legally advised of any local law of Georgia on the subject. The answer avers a particular local law of that State, and the note of submission states that the case was submitted on the following data: On behalf of defendants: * * * * "9. Code of Georgia, Sec. 2753. 10. 75 Vol. Ga. Reports, page 366. 11. 79 Vol. Ga. Reports, page 796," * * * * * * but these data are not found in the record. There appears a written agreement of counsel to abridge the record by omitting certain specified matter, not including the above, and it is therein expressly stipulated that all other matter should be included in the transcript. There is no agreement that we may look into the Georgia Code and reports to supply the omission; on the contrary, it is earnestly contended by appellant's counsel, in their brief, that we have no evidence of a local law of Georgia. This question was very clearly settled in *Drake v. Glover*, 30 Ala. 382, *supra*. There, the record showed that several articles of the Code of Louisiana were read in evidence by each party, none of which was set out in the bill of exceptions; and there was no agreement of counsel in reference to them. Judge WALKER said, in his opinion: "The sections of the Code of Louisiana referred to in the bill of exceptions are not set out; and we cannot look into the Code of Louisiana for the purpose of ascertaining what those sections contain. In doing so, we should violate a principle of law well recognized in this court, and take judicial notice of what the statute laws of a sister State are." Georgia being of common origin with our own State, we must presume the common law there prevails. Then what is the common law, on the subject under consideration? We have it tersely declared in *Hawley v. Bibb*, 69 Ala. 52, *supra*, re-adopted in *Hubbard v. Sayre*, 105 Ala. 440. It is, that gambling contracts, such as the cotton

transactions are alleged by the respondents to have been, are void, as offensive to public policy; but, further, where brokers are employed to make such contracts and advance upon them, if in them the broker has no interest; if, in any event, he cannot gain or lose; whether there is profit or loss he is entitled to his commissions only, the principal is bound to reimburse him for advances, if he subsequently executes his note or bill, or makes an express promise to pay them; or if, with full knowledge of the facts, without objection, he permits the transaction to proceed. A number of authorities are cited by the court. In the State of Georgia, looking to the cases merely as authority, and not as evidence controlling our decision, it was held in *Warren v. Hewitt*, 45 Ga. 501; *Heard v. Russell*, 59 *Ib*. 25; *Champion v. Wilson*, 64 *Ib*. 184, and *Thompson v. Cummings*, 68 *Ib*. 124, that where the alleged illegal contracts have been executed, the broker can recover any money advanced in the transaction by the previous authority or subsequent ratification of the principal. Though questioned in the later case of *Cunningham v. Bank of Augusta*, 71 Ga. 400, the principle was not overruled. See extended note 1 Am. St. Rep. on p. 764, *et seq.*

Applying these principles to the facts of the present case, we find the courts of Georgia were open to the complainants to enforce the note in question. Then,

3. Will the comity which exists between sister States be not extended by Alabama to the State of Georgia, to the end of enforcing the note, in question, according to the latter's laws governing its validity and obligation, by reason of any opposing public policy or positive law obtaining in the State of Alabama? The rules of the common law, above stated, defining the rights of a broker advancing upon gambling contracts, does not obtain where there is a statute, applicable to the case, expressly denouncing the contracts as void.—*Hawley v. Bibb*, 69 Ala. 52, *supra*. Under that authority, the broker cannot recover, in such case, for advances. The statutes of Alabama expressly declare void contracts founded, in whole or in part, on gambling considerations, and authorize recoveries for moneys paid thereon. It is earnestly insisted by counsel that these statutes establish a local rule or policy in Alabama, which forbids recognition by us, of the validity of such contracts, under the

[Peet & Co. v. Hatcher.]

laws of another State, by opening our courts to their enforcement. The courts of the Union are divided on this question. *Flagg v. Baldwin*, 38 N. J. Eq. 219, (48 Am. Rep. 308), presents an elaborate and well considered argument, reviewing authorities, opposing the extension of comity to such a case. See the authorities there referred to, and the cases collected in 8 Am. & Eng. Encyc. of Law, p. 1020, note 6. It seems that New York, Massachusetts, Pennsylvania, Kentucky and Georgia enforce the comity. The earlier New Jersey cases confined its refusal to cases where the parties were citizens of that State. Such was actually the case in *Flagg v. Baldwin, supra*, but the decision seems to regard the distinction immaterial. Money won at play, or lent for the purpose of gambling in a country where the games in question are not illegal, may be recovered in the courts of England, though such contracts be void under the law of England when made there.—*Quarrier v. Colston*, 1 Ph. 147, (6 Jur. 959; 12 L. T. N. S. 57) ; *King v. Kemp*, 8 L. T. N. S. 255, Willes. We cannot yield to the present contention without overruling the cases of *Hawley v. Bibb*, and *Hubbard v. Sayre, supra*. The former case was a bill like this to foreclose a mortgage given to secure a note founded upon a consideration of precisely the same character as that alleged for the present note ; and because the cotton speculations which gave rise to the consideration, were had in New York where the common law was presumed to obtain, it was held that our statutes did not apply, and the mortgage was foreclosed. The principle decided in the *Hubbard Case*, is the same. Realizing the force of the opposite contention, we might be disposed to grant the request of counsel to restore the case to the docket, that this question might be reargued, if there were not other grounds, which we will proceed to notice, clearly fatal, as we conceive, to the respondents' cause.

The bill very distinctly avers and puts in issue the fact, that after the close of the transactions between the parties, the complainants brought suit against Hatcher, in the Supreme Court of the city and county of New York, in that State, to recover upon the same indebtedness (and more) as that represented by the note which the mortgage, now sought to be foreclosed, was given to secure ; that Hatcher was personally served with process

and appeared by attorney in defense of the action ; and on the 8th day of January, 1889, the complainants recovered judgment, in the action, in the sum of $19,576.80 and costs. This recovery and the jurisdiction of the court of the subject matter and person are conceded. It is objected against its effect as *res judicata*, in the cause, that the *note* in question was not declared on. The action was upon the indebtedness in its original form of account. It seems useless to argue so plain a proposition that if the note represented the same consideration as the account sued on, the recovery upon the account, establishing the validity of its consideration, is conclusive of the validity of the consideration of the note. The account and note were cumulative evidences of the same debt ; both simple contracts. An action could have been maintained upon either. Indeed, it being shown that the note was given to close the account, the former was admissible evidence to support the declaration upon the latter. Whatever the form of the action, whether upon the account or note, both being supported by the same consideration, the recovery precluded further inquiry into the validity of the consideration of either. And, as we said in *Hawley v. Bibb, supra,* on bill to foreclose the mortgage, no other or further defenses as to the validity of the debt are open, than could be made, if the action were at law upon the debt.

Again, it is insisted, that, at common law, a recovery upon a gambling contract does not establish the validity of the consideration between the parties to the action, precluding inquiry into the consideration by a court of equity, though no reason be shown why the defense was not made at law. We think no principle or authority has yet been promulgated in support of this contention. The remark of the court in *Fenno v. Sayre,* 3 Ala. 458, (pp. 476-7) relied on, simply recognize the jurisdiction of equity, without legislation, *upon a proper showing being made.* Besides, there was no judgment in that case ; but it was contended that it was not permissible for the complainants to prove that the contract between Paulling and Fenno was tainted with gaming, because Fenno had been called on to disclose the entire transaction, and his answer was conclusive. The complainants were creditors of Paulling seeking to annul a certain alleged gambling transaction between him and Fenno, by which,

if permitted to stand, a certain mortgage security given
them by Paulling would be impaired or destroyed.    In
support of the supposed conclusiveness of the answer,
counsel, in the case, referred *arguendo*, to the statute of
1812, providing that "The courts of equity shall have
jurisdiction, in all cases of gambling consideration, so
far as to sustain a bill of discovery, or to enjoin judgments
at law." In response to this, the court said:  "This
statute does not confer upon our courts of chancery, the
entire jurisdiction they possess in cases of gaming con-
tracts; independent of legislation upon the subject,
they may grant relief in such cases, *upon a proper show-
ing being made.*" Counsel overlooked what the court
said immediately following this remark, when stating
the reasons for the act of 1812, thus:  "Anterior to the
act, a party against whom a judgment was recovered,
upon a contract obnoxious to the law against gaming,
was not entitled to go into equity, without showing some
excuse for the failure to avail himself of a legal defense.
To open the door of chancery, in such cases, although
the opportunity of defending at law had been neglected,
was the only additional end proposed by the statute."
See also *Cheatham v. Young*, 5 Ala. 353 ; *Finn v. Barclay*,
15 Ala. 626. The other cases cited were under the in-
fluence of statutes, which, like our own prior to the Code
of 1852, rendered void, not only gambling contracts, but
*judgments* founded thereon. If the supposed common
law principle, contended for, ever obtained anywhere,
the repeal of the act of 1812, and of the statute rendering
gambling judgments void, showed very clearly a legisla-
tive intention that it should not obtain here.

It is next insisted that the statutes of New York au-
thorize the opening of such judgments, without showing
an excuse for not defending at law; and that under the
constitution and laws of the United States which give a
judgment or decree of one State, the same legal effect in
other States, which it has in the State where rendered,
we are required to take judicial notice of the statutes of
the State where rendered, which affect the conclusive-
ness of the judgment. The plausible argument is that
as the Supreme Court of the United States may revise
our judgments, denying rights claimed under the con-
stitution and laws aforesaid, and, in doing so, will look
into the local laws of the State where the judgment was

rendered, so should this court ; that, as said by the Supreme Court of Pennsylvania, holding to this view, "It would be a very imperfect and discordant administration for the court of original jurisdiction to adopt one rule of decision, while the court of final resort was governed by another ; and hence, it follows that in questions of this sort we should take notice of the local laws of a sister State, in the same manner the Supreme Court of the United States would in a writ of error to our judgment." *State of Ohio v. Hinchma*, 27 Penn. St. Rep. 479. Mr. Freeman, in annotating *State v. Twitty*, 11 Am. Dec. 779, after quoting the Pennsylvania case, cites, as supporting the doctrine, *Paine v. Schenectady Ins. Co.*, 11 R. I. 411; *Butcher v. Bank of Brownsville*, 2 Kan. 70 ; *Dodge v. Coffin*, 15 *Ib*. 277, and *Rae v. Hulbert*, 17 Ill. 572 ; and adds : "It was laid down as a general rule in *Carpenter v. Dexter*, 8 Wall. 513, that where one State recognizes an act done under the laws of another, it will, so far as necessary, take judicial cognizance of those laws. This principle, which seems to be obvious, covers the case just cited. Certainly, a court cannot give effect to a judgment, or recognize it as a judgment, without taking notice of the law under which it was obtained." There are decisions of other States the other way ; for instances : *Pelton v. Platner*, 13 Ohio, 209, (42 Am. Dec. 197), and *Holmes v. Broughton*, 10 Wend. 75 (25 Am. Dec. 536). To these latter must be added our own adjudications : *Hinson v. Wall*, 20 Ala. 298 ; *Kohn v. Haas*, 95 Ala. 478.

But whatever may be the better rule, the solution of the question may be dispensed with in this cause. Assuming that we will take judicial notice of the statute of New York, and taking that statute as it is reproduced upon the brief, we find it to be, that all promises, agreements, notes, bills, bonds, or other contracts, *judgments*, mortgages or other securities, or other conveyances whatsoever, made, in whole or in part, on a gaming consideration, or in consideration of any wager, are void ; and money paid thereon may be recovered. It cannot be denied, under this statute, declaring *judgments*, as well as *contracts* void, that in any legal proceeding, in the State of New York, seeking to enforce a judgment rendered in that State, upon a contract founded upon a wager, or any right dependent upon that judgment ; or, in any legal proceeding there, assail-

ing the judgment on account of the wager, either directly or collaterally, the judgment would be annulled upon averment and proof of the nature of the consideration. If that nature appeared upon the record, the judgment would be void on its face. Not so appearing, however, it would, necessarily, be voidable only by allegation and proof. The judgment, upon its face, in such case, would be valid. These, we think, are the necessary effects of such a judgment, influenced by such statute, and upon them the appellees rely ; and under the constitution and laws of the United States, before referred to, these effects must be accorded to the judgment, in any State of the Union, where it may come in controversy. The same defenses could have been made against the New York judgment, in the State of Georgia, that could have been made in New York. After the recovery in New York, as the bill expressly avers and puts in issue, the plaintiffs therein sued the defendant, upon that judgment, in the proper law court of the county of the defendant's residence, in the State of Georgia, having jurisdiction of the subject matter, and acquiring jurisdiction of the person, by personal service. The record not disclosing the gambling nature of its consideration, the judgment, as we have said, was valid on its face. There was no statute or law of the State of Georgia, brought before us, declaring void judgments based upon wagers. What then was the defendant's duty, when thus sued in Georgia, if he desired to avail himself of the invalidity of the judgment sued upon, under the laws of New York? It was, unquestionably, to plead and prove the nature of the consideration of the judgment sued upon. He failed to make this defense ; or, making it, the issue was decided against him, and judgment was rendered for the plaintiffs. The gambling act of Georgia, (assuming that we will take notice of it under the constitution and laws of the United States), rendering only *contracts*, and not *judgments*, void, that recovery was conclusive of the validity of the consideration of the New York judgment sued upon ; as much so, as if the gambling contract itself had been the cause of action in the Georgia court. Under the constitution and laws of the United States, we must give this judgment the same effect as would be given it in Georgia, where rendered. Thus, inquiry into the validity of the

consideration is forever foreclosed by the last named recovery.

It is insisted that, as matter of fact, the indebtedness, which formed the basis of these recoveries, was other and different from that secured by the mortgage; that payments made by the defendant should be applied by the court to that part of the indebtedness which was secured by the mortgage. The note and mortgage were executed June 26, 1885. The cotton speculations, as agreed to at that time, were thereafter continued until December 28th, 1885. There were two remittances made by Hatcher to complainants; one November 7th, 1885, $3,000, and the other December 11th, 1885, $4,442.63. These were the only payments made after the mortgage, except the current profits of speculations, which were passed to Hatcher's credit, and which were largely overbalanced by the current losses, which were charged to him. Thus, on July 8th, 9th, 10th, 11th and 23d there were aggregate losses of $20,398.27, against profits, July 15th and 29th, aggregating $12,087.76—net loss, $8,310.51. On October 9th, 14th, 20th, 21st, aggregate losses, $6,770.78, with no profits. On December 28th, losses, $6,301.34, with no profits—total net losses, after the mortgage was executed, $21,382.63. On June 15th, there was a payment of $2,503.75, on estimated losses on contracts then existing, but not closed until July. After adding the balance of losses, estimated as having accrued when the mortgage was given, and adjusting interest and certain return commissions, and deducting the two payments of November 7th and December 11th, there was due complainants December 31, 1885, $17,461.10. We have carefully examined the evidence and have not the slightest doubt that the November payment was for margins or reimbursement on current dealings, with no thought or intent on the part of either, that it was to reduce or impair the mortgage security; and as to the payment of December 11th of $4,442.63, it is too plain for serious controversy that, as Peet and Ellis positively swear, it was paid expressly to cover the purchase of 5,000 bales of cotton which was made on December 7th. Hatcher agreed to remit $5,000, to induce and cover that purchase, but when he forwarded his check from Columbus, Ga., on the 9th, it called for, net, only $4,442.63; and

Ellis, acknowledging its receipt on the 11th, called upon him to remit the balance of the $5,000, as agreed, which he never did. It is true, Hatcher in his deposition, makes the statement that upon a proposition made by Ellis, "as per letters attached dated October 27th, November 16th and December 11th, 1885, agreeing if I would pay the firm five thousand dollars on the note, that he would get his firm to carry five thousand bales of futures a quarter of a cent without margin, and that I did pay $4,449.30 upon same, which has never been credited on the note as per letters attached." But when the letters referred to are examined, it is seen that he is mistaken. The letter of October 27th from Ellis, contained, among other things, a proposition to Hatcher that if he would pay his note due November 4th (for $10,000), he would get the firm to carry 5,000 bales for him without calling for margin of ¼c. The letter of November 16th from Ellis inquires: "Why don't you adopt my suggestion about the 5,000 b. c., pay up your note ($10,000) and buy some cotton?" Hatcher attaches no correspondence showing any proposition, at all, relating to a payment of $5,000 on the note, or otherwise. There was evidently some other arrangement, afterwards made, for the payment of $5,000, for the reason that Ellis, in acknowledging receipt of the check for $4,443.63 net, on December 11th, writes: "We enclose credit note for proceeds, $4,443.63, and await further remittance of $557.37 to complete the $5,000 as per your agreement." Hatcher does not explain this. Peet and Ellis explain it substantially as we have above stated. Besides, we are satisfied from the testimony of Hatcher himself, as well as all the witnesses who testify upon the subject, that the intention of the parties was that the mortgage should cover, as far as it went, all net arrearages to Peet & Co., which might develop while the speculations were going on.

The decree heretofore rendered in this cause is adhered to ; and the application for rehearing overruled.

Reversed and rendered.