[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 630 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 631 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 632 
The appellant, John Ronald Daniels, was charged under Alabama's 1975 Death Penalty Statute, §§ 13-11-1 through 13-11-9, Code of Alabama 1975 (repealed), for the slayings of Cheryl Moore and Richard (Ricky) Brune in violation of § 13-11-2(a)(10), which proscribes first degree murder wherein two or more people are intentionally killed by one or a series of acts, and in violation of § 13-11-2(a)(7), which proscribes first degree murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire. After the trial court struck from the threecount indictment two counts, one charging the § 13-11-2(a)(7) violation, the jury found Daniels guilty of violating § 13-11-2(a)(10) and fixed punishment at death pursuant to § 13-11-2(a). Thereafter, the trial court conducted a sentencing hearing pursuant to § 13-11-3 et seq.
After making specific findings on the aggravating and mitigating circumstances, the trial court sentenced Daniels to death by electrocution.[1]
On the authority of Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), on remand,396 So.2d 645 (Ala. 1981), and Ritter v. State,403 So.2d 154 (Ala. 1981), this court reversed Daniels's conviction and remanded for a new trial. Daniels v.State, 406 So.2d 1023 (Ala.Cr.App.), cert.denied, 406 So.2d 1024 (Ala. 1981). The United States Supreme Court subsequently issued an order vacating the judgment and remanding the case back to this court for further consideration in light of Hopper v. Evans,456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).Alabama v. Daniels, 457 U.S. 1114, 102 S.Ct. 2920,
 *Page 633 73 L.Ed.2d 1325 (1982). On motion by the Attorney General of Alabama, any further decision by this court was held in abeyance pending the decision of the United States Supreme Court in Baldwin v. Alabama, 472 U.S. 372,105 S.Ct. 2727, 86 L.Ed.2d 300 (1985), which was decided on June 17, 1985. Thereafter, supplemental briefs were filed by both parties and pursuant to Daniels's request, this cause was orally re-argued on October 8, 1985. For the reasons set forth below, we now affirm Daniels's conviction.
The facts and circumstances of the capital offense for which Daniels stands convicted are as follows: Between 5 p.m. and 6:30 p.m. on January 2, 1977, a motorist at the Theodore-Dawes exit of Interstate Highway 10 in Mobile County noticed a body lying on the ground outside the passenger side of an automobile parked on the west approach ramp to 1-10. The motorist summoned a deputy sheriff, who at trial testified that he arrived at the scene at approximately 5:15 p.m. There, the deputy observed 19-year-old Ricky Brune leaning against the driver's door in his vehicle and 15-year-old Cheryl Moore lying beside the car. Both were dead. Later examination revealed that Cheryl had received a .38-caliber bullet wound to the left side of her chest and a shotgun wound inflicted in her back at close range. Her death was due to the .38-caliber bullet penetrating her heart; the shotgun wound was post-mortem. Ricky's death was the result of one of three .38-caliber bullets: one which entered his head; one which entered his right chest, penetrating his heart; and the third which traveled through his right arm, into his chest and neck. A fourth .38-caliber bullet also pierced his right arm. Subsequent examination further revealed that the five .38-caliber bullets recovered from the two bodies were fired from the same weapon. In addition, evidence at the scene, especially powder residue on the back of the front seat, indicated that the .38-caliber gunshots were fired from the back seat of Ricky's automobile. The fact that Ricky's finger was still on the steering wheel indicated that he had been shot in that position, with his hand on the wheel. The shotgun could also have been fired from inside the vehicle or it might have been fired by someone standing over Cheryl's body as it lay on the ground. Latent fingerprints lifted from Ricky's car were compared with the known prints of Daniels; however, they did not match. They also did not match the known prints of the victims.
The toxicologist who examined the bodies estimated that the two teenagers' deaths occurred sometime between 4:15 and 6:15 p.m. The time of death is reduced to the span of 4:15 to 5:15 p.m. because of the deputy sheriff's arrival at approximately 5:15 p.m. Between 4:50 and 5:10 p.m., a motorist observed a light-colored Ford automobile with a dark top, possibly a vinyl top, parked on the westbound Theodore-Dawes exit of I-10. He estimated the vehicle to be a 1967 to 1969 model. He further noted that the engine was running, but the car appeared unoccupied. He saw only this one vehicle and when he passed by within 15 minutes later, the automobile was gone. In fact, at this later time, he saw no vehicle. At the time of the murders, a green 1968 Ford with a dark vinyl top belonged to Brenda Watson, Phillip Wayne Tomlin's sister.
On the evening prior to the murders, at approximately 11:30 p.m. or midnight, Tomlin and Daniels arrived in Brenda Watson's car at the trailer of Randy and Danny Shanks in Mobile. The Shankses are Tomlin's brothers-in-law. Upon arrival, Tomlin introduced Daniels simply as "Ron" and told Randy, in Daniels's presence, that "he had to come to Mobile to kill the guy that killed his brother." Tomlin's brother had died on November 23, 1975, as a result of an accidental shotgun discharge involving Ricky Brune. During this conversation, Tomlin, in Daniels's presence, asked Danny if he could use Danny's car the following day, because he needed to get out of town. Danny talked to him a little while and then told him he was not "going to get involved in what [Tomlin] had to do in Mobile."
At Tomlin's request, Randy consented to rent a room at the Eight Days Inn for Tomlin and Daniels. All four men went in Brenda Watson's car to the hotel. Randy paid for the room with a $100 bill given to *Page 634 
him by Tomlin. He filled out the registration card with false information, except for his name and the city of his address. For the make of car, Randy put " '64 Chevy." Tomlin had told Randy to register the room in Randy's name. Then, they all went to the room, where the Shankses were shown a .38 revolver and a .44 magnum, which were concealed in a briefcase. Randy also saw another gun in a case wrapped in towels and newspapers. After 15 or 20 minutes, Tomlin took the Shankses back to their trailer.
The Shanks brothers saw Daniels and Tomlin around noon the following day, January 2. While Tomlin was putting air in the left front tire of his sister's automobile, Danny asked Daniels where his sister, Tomlin's wife, was. Daniels replied that she was in Houston with his wife. Danny then asked Tomlin how he and Daniels had gotten to Mobile from Houston. Tomlin explained that they had flown into New Orleans and his father had picked them up and brought them to Mobile.
After the murders on January 2, Randy Shanks gave the police a statement at 2:25 p.m. on January 27, 1977. He told about his contact with Tomlin and Daniels on January 1 and 2 and gave a description of the man Tomlin had introduced as Ron. Danny Shanks gave a statement on January 28.
Late in the evening on January 29, Tomlin's sister's 1968 Ford was found abandoned at the New Orleans International Airport. (As of the date of Daniels's trial, this car was still parked in the airport parking lot and it had not been reported stolen.) The left front tire was low. An examination of the car produced seven latent fingerprints, but none matched with Daniels's prints. However, inside the vehicle was found a parking lot ticket from the airport parking lot's automatic dispenser which indicated that the car had entered the lot on January 2 at 8:08 p.m.
The driving time from Mobile to the New Orleans airport is approximately two and a half hours if driving at 65 miles an hour. Eastern Airlines flight 569 from New Orleans to Houston was scheduled to leave at 8:30 p.m. on January 2, but it did not depart until 9:40 p.m. that particular night. Daniels's and Tomlin's names did not appear on the flight registration for that particular flight; however, the evidence showed they could have reserved tickets under assumed names or purchased tickets at the counter, since no identification is required.
On the same day, Detectives Tillman and Baker from the Mobile County Sheriff's Department and Houston Police Department Detective Trimble went to the apartment of Mary Daniels in Houston. After the officers knocked on the door and waited a few minutes, Ms. Daniels opened the door and invited the officers inside when they identified themselves. At the officers' request, she brought a male from the back bedroom into the living room where the officers were. The man was asked his name, to which he replied, "John Daniels." At first, he denied ever being called "Ron." Upon request, Daniels then presented his Texas driver's license with the name "John Ronald Daniels." Daniels was then advised of hisMiranda rights and placed under arrest. He was neither coerced, threatened, nor offered any hope of reward. He was subsequently asked if he knew Phillip Wayne Tomlin, and he replied, "No."
Daniels was taken to the Houston Police Station, where he signed a waiver of rights form after he was read his rights from that form. His signature was not procured by threat, force, or offer of any hope of reward. Daniels then gave an oral statement wherein he admitted that his nickname was "Ron" and that he knew Tomlin. He also told the officers that, on January 1 and 2, he and Tomlin and their wives were at the Danielses' apartment, which he did not leave except to go to a convenience store. He further explained that he had been to Mobile only once, four or five months prior to January 1, when he went with Tomlin to take a pick-up truck. At that time, he said, he met Tomlin's father. He denied any knowledge of the killing of the two teenagers. *Page 635 
Later that night, Daniels's wife gave the officers permission to search the apartment. The officers found a briefcase under the bed in the back bedroom; attached was a baggage check for Eastern Airlines flight 569 from New Orleans to Houston. At trial, the agent issuing the ticket identified the writing as his and testified that he had worked in that position for only one month prior to January 2. He also explained that checked luggage is not opened or checked with a metal detector. Inside the briefcase were three 16-gauge shotgun shells. One of the shells was subsequently compared with the 16-gauge wadding and pellets taken from Cheryl's body. Both sets of pellets were # 6 shot and the waddings were similar in physical characteristics.
The State also introduced testimony that, while in jail, Daniels told fellow inmate Melvin Turberville that he and Tomlin had killed a boy and a girl out on the Interstate at Theodore-Dawes Road. According to Turberville, Daniels specifically mentioned that he had killed the girl and also explained that they had killed them because the boy had killed Tomlin's brother. Turberville further disclosed that, during the conversation, Daniels was "unconcerned and smiling." Turberville stated that he voluntarily revealed this information and gave a statement on March 20, 1978.
Daniels's defense at trial was alibil. He testified that he spent the night of January 1 with Pat DeGarbo and left her residence in Humble, Texas, sometime on the morning of January 2. Daniels further stated that, during the evening of January 2, he saw Billy Van Kamp at a bar in Houston. A Ms. DeGarmo (who testified she lived in Huffman, not Humble) and a Mr. Von Kamp substantiated Daniels's version of his whereabouts. In recanting the alibi given to the police at the time of his arrest, Daniels attributed the first version to his desire that his wife remain ignorant of his true whereabouts.
Daniels also testified before the jury that he at no time tried to hide his identity or his nickname "Ronnie" from the police officers nor did he deny that he knew Tomlin.
He further stated that, when he was arrested in his home at Houston, he did not know why the police were taking him to the police station. Regarding his statement, Daniels admitted that he was advised of his Miranda warnings; he did not assert any of those rights; and he freely and voluntarily talked to the officers. Regarding Turberville's testimony, Daniels denied "hardly even talk[ing] to the man." Regarding his relationship with Tomlin, Daniels explained that he had known him since 1972 or 1973. He also testified that, contrary to the Shankses' testimony, he had met Randy and Danny Shanks through Tomlin in Houston, Randy in 1974 or 1975 and Danny in 1976. Regarding the airline baggage ticket and the shells discovered in his apartment, Daniels explained that the shells must have been left in the luggage after a hunting trip at his ex-brother-inlaw's house in east Texas and that the baggage tag was left on his luggage from a trip to New Orleans in October or December.
In addition to Daniels's testimony, three witnesses vouched for Daniels's reputation in the community as being a good one.
The defense also called a Mr. Williams, who testified that, when he stopped at the bottom of the I-10 exit ramp at Theodore-Dawes Road on January 1, he noticed a maroon Pontiac parked on the shoulder of the road; the passenger door open; and someone outside the car, either squatting by the car or leaning into the car. He further stated that, during the four or five minutes he was waiting for another car which was to follow him, he saw a 1963 or 1964 white Chevrolet stop by the parked car for a minute or two and then pass him at a speed of 70 or 80 miles per hour. Mr. Williams also stated that he passed the white vehicle eight or ten miles down the road.
Another witness, the driver of the vehicle following Mr. Williams, stated that he went down the ramp sometime between 4:45 and 5:10 p.m. He testified that he, too, later saw a white Chevrolet on the Interstate. He described it as rusted, banged up, and a 1962, 1963, or 1964 model. He explained *Page 636 
that he remembered the car because it was going at a slow speed and the trunk was open six to eight inches even though it was raining.
Mr. Pugh, a convict in the county jail, testified that he grew up with Randy and Danny Shanks and that in March 1977, he saw the Shankses driving a "ragged looking" white 1962 Chevrolet. (However, during his testimony, Randy denied that he owned a white Chevrolet or that he or any of his brothers was driving one in January 1977.) Mr. Pugh also testified that, while in the jail, Turberville mistook him for Tomlin and after he explained that he was not Tomlin, Turberville stated that he had been approached by an assistant district attorney who wanted to make a deal with him to testify against Tomlin, but that he did not know anything, so he was not going to be a witness.
The defense also produced two police officers from Turberville's hometown who testified to the effect that Turberville's general reputation is bad and that his reputation for truth and veracity is bad. In addition, Mr. Neal Hanley, co-counsel for the defense, testified that, during an interview a week prior to trial, Turberville told him that Daniels had not told him anything about his case. During his cross-examination, Turberville admitted that he told Mr. Hanley this, but explained that he said it because he knew that he was Tomlin's attorney.
In addition, during cross-examination of State's rebuttal witness Captain Estes of the Mobile Police Department, the defense counsel questioned him about an interview he had with William Taylor, whose subpoena had been returned as "not found." Estes testified that, on January 7, Taylor told him that he saw Tomlin and Charles Shanks at 5:45 p.m. on the day of the murders; that they were getting out of a car at the Shankses' residence which, in driving time, is five to seven minutes from the murder scene; and that one of them was carrying a shotgun. The only other testimony pertinent to Charles Shanks's alleged whereabouts on the day of the murders is that of his brother Randy, who testified that, as he was driving by his parents' house about 4:30 p.m., he saw Charles, who had been hunting with their cousins. Finally, none of the Shanks brothers' fingerprints were compared with the latent prints taken from the victims' automobile or Brenda Tomlin's vehicle.
 I
Daniels contends that the evidence adduced at trial is insufficient to support his conviction of capital murder. Viewing the State's evidence presented to the jury, which is set out above, by the principles enunciated in Cumbo v.State, 368 So.2d 871 (Ala.Crim.App. 1978), cert.denied, 368 So.2d 877 (Ala. 1979), we find that, even though the evidence is circumstantial, when viewed in a light most favorable to the prosecution, it was sufficient to allow the jury to reasonably find that the evidence excluded every reasonable hypothesis except that of guilt. The State's evidence revealed to the jury the following: Daniels and Tomlin were in Mobile the night before the murders with the expressed purpose of killing Brune; three weapons, one of which was the same type as the murder weapon, were seen in their possession that evening; an automobile similar in description to the one that they were driving in Mobile was placed at the scene in the immediate time frame of the killings; the automobile was later found abandoned at the New Orleans airport with a parking lot ticket inside which indicated the car entered the lot on the night of the murders 22 minutes before the scheduled departure of the Houston flight, thus giving the men time to commit the murders by 5:15 p.m. and arrive in time to fly home; a briefcase with a New Orleans-Houston baggage check which, according to the testimony of the ticket agent, could have only been issued sometime after the first of December and three shotgun shells which were similar to the one spent on Cheryl Moore were discovered in Daniels's apartment; and Daniels's confession to a fellow inmate that he and Tomlin had killed a boy and a girl on the Interstate at Theodore-Dawes Road and, specifically, that he had killed the girl. Clearly, the evidence was inconsistent *Page 637 
with any reasonable theory of innocence; all material circumstances in evidence pointed to Daniels's guilt. Thus, we find that the evidence was sufficient to sustain Daniels's conviction.
 II
Omitting the formal parts, the indictment under which the question of Daniels's guilt was submitted to the jury[2]
charges that Daniels
 "did unlawfully, intentionally, and with malice aforethought kill Richard Brune and Cheryl Moore by, to-wit: shooting each of them with, to-wit: a gun on January 2, 1977, at a location on or near Interstate 10 in Mobile County, Alabama, in violation of Act Number 213, Section 2, Sub-Section J (Act # 213, § 2(j)) Acts of Alabama, Regular Session, 1975, against the peace and dignity of the State of Alabama."
Daniels alleges that his demurrer to this indictment should have been granted on the ground that the indictment fails to adequately state an offense, for the indictment merely charges the first degree murders of two persons without averring the aggravating circumstances[3] required by § 13-11-2(a), Code of Alabama 1975. See also § 13-11-1. Carrying this argument a further step, Daniels contends that these two separate offenses are charged in one count in the conjunctive, which is prohibited by §15-8-52, Code of Alabama 1975.
Although the instant indictment does not contain the averment that the victims were intentionally killed by "one or a series of acts" as required by § 13-11-2(a)(10), this omission did not warrant that Daniels's demurrer be granted. Daniels's challenge to the indictment is foreclosed by the companion case of Tomlin v. State,443 So.2d 47, 52 (Ala.Cr.App. 1979), aff'd, 443 So.2d 59 (Ala. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160,80 L.Ed.2d 545 (1984), wherein this court upheld a virtually identical count of Tomlin's indictment as charging Tomlin with a capital offense rather than with the first degree murder of two persons. In affirming this ruling, our Supreme Court stated the following:
 "The capital murder statute does require that the victim be killed by 'one or a series of acts,' an allegation omitted from count one of the indictment. The omission did not, however, leave the defendant unaware of the nature and cause of the charge against him in light of the reference to the death penalty statute by act number in each count of the indictment."
443 So.2d at 63.
More recently, the court in Hill v. State,455 So.2d 930 (Ala.Cr.App.), aff'd, 455 So.2d 938
(Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607,83 L.Ed.2d 716 (1984), held that the aggravation that the murders were done "by one or a series of acts" is inherently present in the fact that the multiple murders are charged in the same count of the indictment. In so holding, the court reasoned as follows:
 "The fact that the murders are averred in the conjunctive dictates that they occurred at the same time or so near to each other as to constitute the same offense. Burgess v. State, 44 Ala. 190 (1870). Additionally, we note that the fact that there are multiple murders constitutes the aggravating circumstance."
Id. at 933.
Accordingly, we hold that the requisite language of § 13-11-2(a)(10) is sufficiently followed to charge a capital offense of *Page 638 
"[m]urder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts"; therefore the instant indictment properly charges Daniels with a capital offense and the demurrer was properly overruled.
 III
Daniels asserts as error the trial court's denial of his special plea of res judicata or, in the alternative, collateral estoppel. He argues that, by the wording of § 13-11-2(a)(10), Code of Alabama 1975, he could only have been convicted under the instant indictment if he were the principal who intentionally killed the two teenagers, but he could not possibly have been the principal, for Tomlin had already been convicted under a virtually identical indictment and the ultimate fact in issue had been decided. Thus, the prosecution should have been barred from taking a inconsistent position in also prosecuting him as a principal.
First, Daniels's prosecution clearly was not barred by the principles of res judicata and collateral estoppel. Simply put, the general rule of res judicata applies to repetitious litigation involving the same cause of action. Duke v.State, 48 Ala. App. 188, 190, 263 So.2d 165, 167 (1971),rev'd on other grounds, 288 Ala. 544, 263 So.2d 176
(1972). Collateral estoppel, a branch of the broader principle of res judicata, bars relitigation, between the same parties, of an issue of ultimate fact determined at a previous trial. Ashe v. Swenson, 397 U.S. 436, 443,90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); 1 Wharton'sCriminal Law § 72 (C. Torcia 14th ed. 1978).
 "This principle [of collateral estoppel] provides that determination of a factual issue in the defendant's favor at one proceeding estops the government from disputing that fact in another proceeding against the same defendant. . . . For collateral estoppel to apply, both the defendant and the prosecution must have been parties to the prior case. Furthermore, the defendant must be contesting relitigation of an issue of ultimate fact previously determined by a valid and final judgment."
Fourteenth Annual Review of Criminal Procedure: UnitedStates Supreme Court and Courts of Appeals 1983-1984, 73 Geo. L.J. 249, 565-66 (1984) (footnotes omitted). See,e.g., Pooley v. State, 470 So.2d 1337 (Ala.Cr.App. 1985) (wherein the court held that the defendant's acquittal of possession of burglary tools estops the State from prosecuting the same defendant for unlawful breaking and entering a vehicle because the State would be attempting to relitigate a fact which underlies the prior acquittal). For obvious reasons, these two principles could not have operated to bar Daniels's prosecution; Tomlin's conviction could not have been pleaded in bar by Daniels since Daniels was not a party to the former prosecution and was in no way affected by the former judgment. See 21 Am.Jur.2d CriminalLaw § 332 (1981).
Secondly, Daniels's argument has no merit by virtue of § 13-9-1, Code of Alabama 1975 (repealed) (the precursor to § 13A-2-23), which abolished the common law distinctions among accessories before the fact, principals in the second degree, and principals in the first degree, and provided that "all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, though not present, must hereafter be indicted, tried and punished as principals. . . ." "As [principals, all participants] are punishable for their criminal conduct; the fate of other participants is irrelevant." Standefer v. United States,447 U.S. 10, 20, 100 S.Ct. 1999, 2006, 64 L.Ed.2d 689 (1980) (footnote omitted) (wherein the Court ruled that the civil law doctrine of non-mutual collateral estoppel is not applicable in criminal cases, by holding that a defendant accused of aiding and abetting in the commission of a federal offense may properly be convicted despite the prior acquittal of the alleged actual perpetrator). In fact, this court, in reviewing Tomlin's conviction, held that Tomlin could have been properly deemed guilty of capital murder even though he was not the actual *Page 639 
triggerman by virtue of accomplice liability pursuant to § 13-9-1. 443 So.2d at 53. Thus, there is no inconsistency between Tomlin's capital conviction and a prosecution of Daniels for the same murders, whether as the actual triggerman or a non-triggerman accomplice having a "particularized intent to kill." See, e.g., Raines v.State, 429 So.2d 1111 (Ala. 1982), cert.denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368
(1983); Ritter v. State, 375 So.2d 270 (Ala. 1979),vacated on other grounds, 448 U.S. 903,100 S.Ct. 3044, 65 L.Ed.2d 1133 (1980). See also Lindsey v.State, 456 So.2d 383, 389-90 (Ala.Cr.App. 1983),aff'd, 456 So.2d 393 (Ala. 1984), cert.denied, 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403
(1985).
 IV
Appellant also asserts as error the trial court's denial of his motion for mistrial on the ground the trial court excused prospective jurors outside his presence. In denying Daniels's motion, the trial court explained that some of the prospective jurors had been excused because "[w]e don't call sick jurors down" and some apparently did not show up.
For authority supporting this assertion of error, Daniels relies upon §§ 12-16-120 and -122, Code of Alabama 1975, which governed the ordering, drawing, summoning, organization, and examination of a special venire in a capital case until their repeal by 1981 Ala. Acts 1381, No. 788, § 8 (effective January 1, 1982). It is well established that, under these sections, the accused has a right to be present when any excuses are presented by the jurors seeking to be relieved from jury duty, and when such request is granted by the court, a failure to observe this rule mandates reversal. Jones v. State, 53 Ala. App. 542, 302 So.2d 126 (1974). The court in Thigpen v.State, 49 Ala. App. 233, 270 So.2d 666 (1972), however, observed that these provisions are not applicable to Mobile County; rather the selecting and empaneling of juries in Mobile County are controlled by the provisions of Volume 14A, Appendix, §§ 543(5) — (16), Code of Alabama 1940, Recomp. 1958.[4] See also Edwards v. State,452 So.2d 487 (Ala.Cr.App. 1982), rev'd on othergrounds, 452 So.2d 503 (Ala. 1983) (holding that § 543(11), rather than § 12-16-120, is applicable to a Mobile County defendant being prosecuted for capital murder pursuant to § 13-11-2(a)(5), Code of Alabama 1975)). In affirming the trial court's denial of the appellant's motion for mistrial on the same ground as presented in the instant case, the court, in Thigpen, relied upon Appendix § 543(12), which provides the following:
 "Irregularities not constituting grounds to quash venire. — It shall not be a ground to quash the venire or to continue any case of the kinds referred to in this subdivision . . . that any of the jurors summoned have failed or refused to attend court, . . . or that a judge, either in open court or otherwise has, for any cause, excused any juror summoned for service for the week in which said case is set for trial. (1959, p. 956, § 8, appvd. Nov. 6, 1959; 1961, Ex.Sess., p. 2276, appvd. Sept. 15, 1961.)
 "Note. — The 1961 amendment deleted 'with the consent of the defendant' between the words 'has' and 'for' near the end of this section."
In accordance with this authority, the trial court properly excused prospective jurors outside the presence of Daniels and Daniels's motion for mistrial was properly overruled.Cf. Colley v. State, 405 So.2d 374, 381-82
(Ala.Cr.App. 1979), rev'd on other grounds,405 So.2d 391 (Ala. 1981) (holding that the trial judge did not err in excusing prospective jurors outside the defendant's presence, for a local act applicable to the twelfth judicial circuit, rather than § 12-16-120, governs the selection of a jury for a capital case).
 V
As previously noted, the statutory provisions applicable to Daniels's indictment, trial, *Page 640 
conviction, and sentencing are §§ 13-11-1 through -9, Code of Alabama 1975. Daniels contends that the trial court erred in denying his motion to quash the indictment on the ground that the capital statute by which he was indicted is unconstitutional on its face because of (1) its "preclusion clause," the express prohibition against the jury's consideration of lesser included offenses, and (2) its "verdict-form requirement," the mandatory imposition of death by the jury upon the jury's finding of guilt. These two provisions are found in § 13-11-2(a), which provides as follows:
 "If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses. . . ." (emphasis added).
 A.
In regard to Daniels's first assertion of unconstitutionality, while Daniels's appeal was pending before this court, the United States Supreme Court issued its opinion in Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), wherein the Court reviewed the constitutionality of the preclusion clause. It held that a sentence of death imposed after a jury verdict of guilt of a capital offense is constitutionally impermissible when the jury was precluded from considering a verdict of guilt of a lesser included noncapital offense and when the evidence would have supported such a verdict. The particular portion of the Alabama statute declared unconstitutional was severed from the statute per Beck v. State, 396 So.2d 645
(Ala. 1981). Thereafter, in Hopper v. Evans,456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), in confronting the issue of whether "[a]fter invalidation of a state law which precluded instructions on lesser included offenses in capital cases, a new trial is required in a capital case in which the defendant's own evidence negates the possibility that such an instruction might have been warranted," id. at 606, 102 S.Ct. at 2050, the Court elaborated on its prior holding in Beck, as follows:
 "Beck held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence. Under Alabama law, the rule in noncapital cases is that a lesser included offense instruction should be given if 'there is any reasonable theory from the evidence which would support the position.' Fulghum v. State, 291 Ala. 71, 75, 277 So.2d 886, 890 (1973). . . . The Alabama rule clearly does not offend federal constitutional standards, and no reason has been advanced why it should not apply in capital cases."
Id. at 611-12, 102 S.Ct. at 2052-53 (emphasis in original). After reviewing Evans's trial testimony, the Court determined that no evidence was present to warrant a lesser included offense instruction and that "[Evans] suggests no plausible claim which he might conceivably have made, had there been no preclusion clause, that is not contradicted by his own testimony at trial." Id. at 613,102 S.Ct. at 2053. In conclusion, the Court held that "[t]he preclusion clause did not prejudice [Evans] in any way, and a new trial is not warranted." Id. at 613-14,102 S.Ct. at 2053-54. Accordingly, the question before us, as addressed in supplemental briefs, is whether Daniels is entitled to a new trial because he was prejudiced by the existence of the preclusion clause in the statute at the time of his trial and conviction.
The test to determine the effect of the preclusion clause on a pre-Beck trial was set forth in Cook v.State, 431 So.2d 1322, 1324 (Ala. 1983), as follows:
 "(1) Was there any evidence presented at trial upon which a conviction of a lesser included offense could have been based?
 (2) If not, has the defendant suggested any plausible claim which he might conceivably *Page 641 
have made, had there been no preclusion clause, that is not contradicted by his own testimony at trial?"
As later noted by our Supreme Court, the first question is derived from Beck v. Alabama, while the second one was first suggested in Hopper v. Evans. Baldwin v.State, 456 So.2d 129, 133 (Ala. 1984), aff'd onother grounds, 472 U.S. 372, 105 S.Ct. 2727,86 L.Ed.2d 300 (1985). If the answers to both questions are "no," then the defendant is not entitled to a new trial and his pre-Beck conviction is due to be affirmed.Cook, 431 So.2d at 1324.
In determining the answer to the first question, we begin with the principle that the defendant's assertion of an alibi defense and, thus, a denial of the offense for which he is charged does not automatically foreclose his right to jury instructions on any lesser included offenses. In Pruittv. State, 457 So.2d 456, 457 (Ala. 1984), our Supreme Court explained, as follows:
 "In denying the writ, we are not to be understood as approving the holding of the Court of Criminal Appeals that 'where the defendant denies the event in toto, the court is not obliged to charge on a lesser included offense.' 457 So.2d 454 (Ala.Crim.App. 1979). The accused is entitled to have the trial court charge on lesser included offenses where there is a reasonable theory from the evidence supporting defendant's position, regardless of whether the State or defendant offers the evidence. See Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978). The Court of Criminal Appeals reached the correct result in Williams [v. State, 377 So.2d 634 (Ala.Cr.App. 1979)], a case 'where the only reasonable conclusion from the evidence is that the defendant is guilty of robbery [the greater offense] or no crime at all.' 377 So.2d at 637. If, however, the defendant denies the charge but the evidence presented by the State suggests a reasonable theory supporting a charge on a lesser offense, the trial court is obliged to give a charge on the lesser offense when requested."
See also Stork v. State, 475 So.2d 623 (Ala. 1985);Curry v. State, 471 So.2d 476 (Ala. 1984) (Torbert, C.J., concurring in part and dissenting in part); Wrightv. State, 494 So.2d 726 (Ala.Cr.App. 1985). Thus, although Daniels's alibi defense certainly would not have supported a conviction for a lesser included offense, we must turn to the evidence presented by the prosecution and determine if it presents "a reasonable theory supporting a charge on a lesser offense."
Daniels argues in brief that "[a] rational juror could have entertained doubts about the extent and character of his participation"; "[t]he evidence presented left unanswered questions bearing upon whether Daniels had the particularized intent to kill two persons." He explains that the evidence, at most, showed that Daniels participated to some unknown extent in the killings, but he and Tomlin had come to Mobile to kill only one person.
We disagree; after a careful review of the evidence presented to the jury, we are convinced that the State's evidence, although circumstantial, offered no reasonable theory supporting a conviction of a lesser included offense. The evidence established that Cheryl Moore and Richard Brune were the victims of brutal murders committed by one or a series of acts and that Tomlin and Daniels were the murderers. Furthermore, the evidence supports only the theory that Daniels was the actual killer or had, as a non-triggerman accomplice, the "particularized intent" to kill not only Richard, but also Cheryl. His confession to inmate Turberville wherein he specifically admitted to killing the girl and the discovery in his apartment of 16-gauge shotgun shells containing wadding and pellets similar to those taken from Cheryl's body confirm that Daniels was an active participant in Cheryl's killing; clearly, even if an accomplice, Daniels's participation was not minor. Therefore, neither the prosecution's evidence nor Daniels's defense presented any evidence or reasonable theory from the record that Daniels might have been guilty of only one of the murders or of any other lesser included offense. "In addressing the first prong of the Cook test, we need not speculate as to *Page 642 
evidence that might have been presented to provide the missing links in the lesser included offense theories that the appellant now asserts." Bracewell v. State,475 So.2d 616, 619 (Ala.Cr.App. 1984) (emphasis in original). Clearly, if the jury believed Daniels, he must have been found not guilty; if they believed the prosecution's evidence, he must have been found guilty of the crime charged. See Cook, 431 So.2d at 1324-25. Thus, we determine the answer to the first question to be "no."
Likewise, we find the answer to the second question to be "no" by virtue of the following observation by theCook court:
 "[W]hen a defendant takes the witness stand and testifies that, because he was in a distant location when the crime took place, he could not possibly have committed it, he has directly contradicted any evidence which he might later produce to show that he was guilty of a lesser included offense."
Id. at 1325. See also Wright v. State, supra; Bryars v. State, 456 So.2d 1122, 1127
(Ala.Cr.App. 1983), rev'd on other grounds,456 So.2d 1136 (Ala. 1984).
Hence, we find that Daniels was not prejudiced by the existence of the preclusion clause in the statutory scheme under which Daniels was convicted. This was also the conclusion of our Supreme Court in regard to Daniels's codefendant, in Tomlin v. State, 443 So.2d 59 (Ala. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160,80 L.Ed.2d 545 (1984), wherein Tomlin, like Daniels, testified that he was in Texas at the time of the killings. In Tomlin, the court stated the following:
 "We examined in Cook v. State, supra, the effect of an alibi defense on the question of whether a defendant convicted under the 1975 death penalty statute is entitled to a new trial because of the preclusion clause. We concluded that when a defendant testified that he was in a distant location when the crime was committed, his own testimony directly contradicted any evidence he might have introduced to show that he was guilty of a lesser included offense. Cook, supra, at 1325.
 "Cook is clearly controlling here. The petitioner argued that, but for the preclusion clause, he might have introduced evidence that Daniels, who was allegedly with Tomlin at the time in question, did the killing, or that Tomlin intentionally killed only one of the victims, or that Tomlin was under the influence of drugs at the time of the killings. All of the claims suggested by the petitioner are, however, in conflict with Tomlin's own testimony. Tomlin is not, therefore, entitled to a new trial based on the presence of the preclusion clause in the statute."
Id. at 62. Tomlin and Cook are clearly controlling. See also Wright v. State, supra; Hill v. State, 455 So.2d 930 (Ala.Cr.App.),aff'd, 455 So.2d 938 (Ala.), cert. denied,469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984). Accordingly, we hold that Daniels is not entitled to a new trial.
 B.
In asserting the alleged unconstitutionality of the verdict-form requirement of § 13-11-2(a), Code of Alabama 1975, Daniels specifically argues that (1) the requirement that the jury impose death upon its finding of guilt violates the requirement of Furman v. Georgia, 408 U.S. 238,92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), that "standardless, jury discretion be replaced by procedures that safeguard against arbitrary and capricious imposition of death sentences," Roberts v. Louisiana, 428 U.S. 325, 334,96 S.Ct. 3001, 3006, 49 L.Ed.2d 974 (1976); (2) in its sentencing, the jury is prohibited from considering any mitigating circumstances; (3) the jury's mandated sentence of death violates the defendant's Sixth Amendment right, for his punishment should be "tempered and governed by the controlling community standards of his peers" (appellant's brief, p. 18); and (4) the judge is permitted to impose arbitrary and capricious sentences of death because the statutory scheme provides no procedures or standards that safeguard against such sentences.
In its recent opinion in Baldwin v. Alabama,472 U.S. 372, 105 S.Ct. 2727, *Page 643 86 L.Ed.2d 300 (1985), the United States Supreme Court upheld the constitutionality of the death sentence imposed by the trial court under the 1975 Alabama Act which requires that the jury "shall fix the punishment at death" if it finds the defendant guilty. Baldwin, in the Alabama Supreme Court, had argued in part "that the jury's mandatory sentence was unconstitutional because it was unguided, standardless, and reflected no consideration of the particular defendant or crime. . . ." Id. at 378, 105 S.Ct. at 2731. The Alabama court rejected this argument by holding that "even though the jury had no discretion regarding the 'sentence' it would impose, the sentencing procedure was saved by the fact that it was the trial judge who was the true sentencing authority, and he considered aggravating and mitigating circumstances before imposing sentence." Id. at 379-380, 105 S.Ct. at 2731-32 (citing Baldwin v.State, 456 So.2d 129, 139 (Ala. 1984)).
In affirming the judgment of the Supreme Court of Alabama, the Court noted that if the jury's "sentence" were indeed the dispositive sentence, the Alabama statute's requirement that the jury impose a mandatory sentence would, in fact, suffer defects recognized in Woodson v. North Carolina,428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). See469 U.S. at 379, 105 S.Ct. at 2732. Two of these defects are raised by Daniels: (1) juries exercise unguided and unchecked discretion in determining who will be sentenced to death, and (2) a mandatory sentence disallows particularized consideration of the character and record of the accused and the circumstances surrounding the offense.
However, in answer to Baldwin's assertions and, consequently, in answer to Daniels's first two contentions in the present issue, the Supreme Court concurred with the Alabama Supreme Court in concluding that "[t]he jury's mandatory 'sentence' . . . does not stand alone under the Alabama scheme." Ibid. Rather, in accordance with the directives of § 13-11-3, the trial court holds a separate sentencing hearing in which the court independently hears any relevant evidence of aggravating and mitigating circumstances and determines whether the aggravating circumstances outweigh the mitigating circumstances. The Court further ruled that, even though § 13-11-4 speaks in terms of requiring the court to weigh the jury's fixing of punishment at death along with the aggravating and mitigating circumstances, the trial court is not required to consider the jury's "sentence" as a recommendation by the jury of the sentence it deems to be appropriate or to accord any deference to the jury's "sentence." Id. at 382-385,105 S.Ct. at 2733-34. The Court based this holding on two grounds. The first — the Alabama appellate courts' interpretation of the Act — is reflected in the following passage:
 "The Alabama appellate courts have interpreted the 1975 Act expressly to mean that the sentencing judge is to impose a sentence without regard to the jury's mandatory 'sentence.' The Alabama Court of Criminal Appeals has stated: 'The jury's function is only to find guilt or innocence. The jury is not the sentencing authority.' Jacobs v. State, 361 So.2d 607, 631 (1977), aff'd, 361 So.2d 640 (Ala. 1978), cert. denied, 439 U.S. 1122
[99 S.Ct. 1034, 59 L.Ed.2d 83] . . . (1979). Indeed, the court has gone so far as to state:
 'No sentence exists until the pronouncement by the trial judge at the conclusion of the sentence hearing. It is for this reason that the court cannot be said to be commuting a sentence of death imposed by the jury, but, in truth and in fact, it is sentencing the accused after a jury's finding of guilt.' Beck v. State, 365 So.2d 985, 1005, aff'd, 365 So.2d 1006 (Ala. 1978), rev'd on other grounds, 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392] . . . (1980).
 "The court further has described the judge's role as follows:
 'The sentencing hearing is one of the most important and critical stages under Alabama's death penalty law. The guilt stage has passed. Now an experienced trial judge must consider the particularized circumstances surrounding the offense and the offender and *Page 644 
determine if the accused is to die or be sentenced to life imprisonment without parole. . . . The trial evidence must be reviewed to determine all of the aggravating circumstances leading up to and culminating in the death of the victim and then all the mitigating circumstances must be considered in determining if any outweigh the aggravating circumstances so found in the trial court's findings of fact.' Richardson v. State, 376 So.2d 205, 224 (1978), aff'd, 376 So.2d 228
(Ala. 1979).
 "Conspicuously absent from the court's description of the judge's duty is any mention of according weight or deference to the jury's 'sentence.'
 "The Supreme Court of Alabama agrees that 'the jury is not the sentencing authority in . . . Alabama,' and has described the sentencing judge not as a reviewer of the jury's 'sentence,' but as the sentencer:
 'In Alabama, the jury is not the body which finally determines which murderers must die and which must not. In fact, Alabama's statute mandatorily requires the court to "hold a hearing to aid the court to determine whether or not the court will sentence
the defendant to death or to life imprisonment without parole," and specifically provides that the court may refuse to accept the death penalty as fixed by the jury and may "sentence" the defendant to death or life without parole. Code of Ala. 1975, § 13-11-4. That section provides that if the court imposes a "sentence of death" it must set forth, in writing, the basis for the sentence.' Jacobs v. State, 361 So.2d 640, 644
(1978), cert. denied, 439 U.S. 1122
[99 S.Ct. 1034, 59 L.Ed.2d 83] . . . (1979) (emphasis in original; footnote omitted).
 "See also Ritter v. State, 429 So.2d 928, 935-936 (Ala. 1983); Beck v. State, 396 So.2d 645, 659 (Ala. 1981)."
Id. at 383-385, 105 S.Ct. at 2734-35. In concluding that the Act is not unconstitutional as requiring the judge to consider the jury's "sentence," the Court also considered that, in the record before it, the sentencing judge clearly did not interpret the Act as requiring him to consider the jury's "sentence." Id. at 386, 105 S.Ct. at 2735.[5]
Finally, the Court, in rejecting Baldwin's assertion that the trial court's decision to impose the death sentencemust be influenced by the jury's "sentence," stated:
 "The jury's 'sentence' means only that the jury found the defendant guilty of a capital crime . . . and that if the judge finds that the aggravating circumstances outweigh the mitigating circumstances, the judge is authorized to impose a sentence of death. The 'sentence' thus conveys nothing more than the verdict of guilty, when it is read in conjunction with the provisions of the 1975 Act making the offense a capital crime, would convey. It defies logic to assume that a judge will be swayed to impose the death penalty by a 'sentence' that has so little meaning. Despite its misdescribed label, it is not a sentence of death."
Id. at 388, 105 S.Ct. at 2736.
Thus, because the jury had absolutely no sentencing authority, Daniels's first two assertions are without merit. This brings us to his third attack on the statutory scheme under which he was sentenced — that the jury's mandatory sentence deprived him of his right to jury participation in the sentencing decision. However, this argument is also without merit.
In reviewing the administration of Florida's capital sentencing statute which allows the trial court to overrule the jury's *Page 645 
recommendation of life imprisonment and sentence the defendant to death, the United States Supreme Court inSpaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154,82 L.Ed.2d 340 (1984), addressed the fundamental premise asserted by Spaziano "that the capital sentencing decision is one that, in all cases, should be made by a jury."Id. at 458, 104 S.Ct. at 3161. Spaziano argued that most States recognize that juries rather than judges can better make a reliable decision on capital sentencing because, since the death penalty "is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death," the jury is in the best position to serve as the voice of the community.Id. at 461, 104 S.Ct. at 3163 (quoting Gregg v.Georgia, 428 U.S. 153, 184, 96 S.Ct. 2909, 2930,49 L.Ed.2d 859 (1976)). While acknowledging "the significance of the jury's role as a link between the community and the penal system and as a bulwark between the accused and the State,"id. at 462, 104 S.Ct. at 3164, and, also, recognizing the majority view that capital sentencing should be performed by a jury, ibid., the Court held that there is no constitutional requirement that a jury determine the appropriate punishment to be imposed. In so holding, the Court stated:
 "In light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional."
Id. at 464, 104 S.Ct. at 3164.
Daniels's final assertion of unconstitutionality of the sentencing scheme of the 1975 Act — that the statute provides no procedures or standards safeguarding against arbitrary and capricious sentences of death — is likewise without merit. Section 13-11-3 requires that upon a jury's verdict of guilty, the trial court must hold a separate hearing to aid it in determining whether to impose the sentence of death or of life imprisonment without parole. It further provides that any relevant evidence may be presented and that evidence relating to the enumerated aggravating and the mitigating circumstances must be presented. Section 13-11-4 provides that the court shall impose the appropriate sentence only after weighing the aggravating and mitigating circumstances and that, in the event the court imposes the death penalty, it shall set forth in writing its findings of fact, which shall include the enumerated aggravating circumstances and the mitigating circumstances that formed the basis for the sentence. These procedures afford a constitutional sentencing scheme which is in nowise tainted by arbitrariness or capriciousness; the provisions for the separate proceeding allow and require focus on the circumstances of the particular offense and the character of the defendant, thus channeling the sentencing authority's discretion. Ritter v. State,429 So.2d 928, 936-37 (Ala. 1983). See also Jacobs v. State,361 So.2d 607, 628-34 (Ala.Cr.App. 1977), aff'd 361 So.2d 640
(Ala. 1978), cert denied, 439 U.S. 1122,99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).
 VI
Daniels contends that his arrest was illegal and that, consequently, his statements given after his arrest and the evidence secured from the search of his apartment were not admissible since they were "fruits of the poisonous tree." Daniels further argues that the items obtained during the search were also not admissible because his wife's consent to search was unknowing, unintelligent, and involuntary and it was the product of an illegal arrest of Ms. Daniels.
These various contentions were raised several times during the trial. Immediately after the jury was selected, the trial court heard voir dire testimony on Daniels's pre-trial motion to suppress any physical evidence taken from his residence on the ground that it "was seized in violation of [his] constitutional right to be protected from unreasonable search and seizure." *Page 646 
The suppression hearing was continued and the trial progressed until Ms. Daniels was available to testify. After she and Daniels testified, the court denied Daniels's motion. Later in the trial, another suppression hearing was conducted on Daniels's motion to suppress his statements on the ground that they were the product of an illegal arrest. The trial court subsequently denied this motion and Daniels's motion to reconsider its ruling on the motion to suppress evidence seized during the search. In addressing Daniels's assertions on appeal, we look to the sum of each witness's testimony given during the various suppression hearings.
Detective Tillman of the Mobile County Sheriff's Office gave the following rendition of events leading up to and surrounding Daniels's arrest:
Detectives Tillman and Baker from the Mobile County Sheriff's Office arrived in Houston on January 29, 1977, without a warrant for Daniels's arrest. They were assisted in Houston by Investigator Trimble of the Houston Police Department.
Sometime between 8 p.m. and 9 p.m. on January 29, the three law enforcement officers went to the apartment of Mary Daniels, who they later learned is Daniels's wife. Before going, the only information they had obtained was what Faye Tomlin had told them. Ms. Tomlin, who worked with Mary Daniels, had told the officers that a man named Ron stayed at Mary Daniels's apartment sometimes. They did not know if Ron was Ms. Daniels's boyfriend or husband and they did not know if he was there at the time; they just knew that a Mary Daniels lived there. Before they went to Ms. Daniels's apartment, an unidentified officer called her. Tillman did not know the content of the conversation, but he thought the officer asked Ms. Daniels if Ron was there; she replied, "No"; he asked her if they could come and talk with her; and she consented.
After the officers arrived at the apartment, they were waiting for someone to answer the front door when they heard some scuffling. Tillman went to the back of the apartment building to locate the Danielses' back door; however he could not determine which of the 50 or so doors it was, so he returned to the front. By this time, Ms. Daniels was at the front door. Trimble identified him and the other two officers and asked her if a man named Ron lived there. She stated that she did not know anyone named Ron. Then, Trimble asked her if someone was there with her and she answered affirmatively, explaining that she had a date for the night who was in the back bedroom. Trimble asked if they could talk with him and Ms. Daniels stated that she did not know, that she would have to talk to him because he did not want to get involved, and that the date did not know anything about what was going on. At the officer's request, she allowed them to enter the apartment and, after Trimble asked her if she would retrieve her date from the back bedroom, she consented, left them in the front room, and then came back with her "date." The man identified himself as "John Daniels" and denied being Ron. During the conversation, Daniels also denied knowing Tomlin, denied being in Mobile, and denied knowing Ricky Brune. Upon being asked for identification, he produced a driver's license issued to John Ronald Daniels. During further conversation, Daniels explained that he sometimes went by the nickname "Ron." Daniels was orally read his Miranda
rights at some point during the interview at the apartment. In addition, no one coerced or threatened Daniels or offered him any hope of reward in order to obtain a statement.
After Trimble arrested Daniels, the officers took Daniels to the police station. Ms. Daniels voluntarily accompanied him at the officer's request. During transportation to the station, there was no conversation. After arriving at the station at approximately 9 p.m., and in Baker's presence, Tillman read Daniels his Miranda warnings and a waiver of those rights from a waiver form. Daniels said he fully understood his rights, and he also signed the waiver form. Tillman then asked Daniels if he would give a statement and Daniels consented to give an oral statement, but would not allow the officers to write anything down. At this time, he did not exercise his right to counsel; *Page 647 
rather he said he neither needed nor wanted an attorney. No statements of a coercive nature or promises of hope of reward were made to Daniels in order to obtain a statement from him. During the interview with Daniels, which lasted only 20 or 30 minutes, Tillman asked him if he knew Tomlin. Daniels answered that he did in fact know Tomlin and that Tomlin and his wife had stayed at his apartment on January 1 and 2. He denied having been in Mobile or going anywhere with Tomlin during this time period and stated that he did not even leave his apartment during those two days except to go to the grocery. He further denied knowing Ricky Brune or Cheryl Moore, but he admitted that he knew Tomlin's father and that the only time he had been to Mobile was for a car transaction with Tomlin's father four or five months prior to January 1977.
After talking with Daniels, Tillman talked with Ms. Daniels. He advised her of her Miranda rights, she signed a waiver, and she consented to give a written statement which she also signed. While at the police station, Ms. Daniels also signed a "Voluntary Consent for Search and Seizure," giving the officers authorization to search the Danielses' apartment. Ms. Daniels's consent was not obtained by any coercion or threats and she did not object to a search. No one told her that if she did not want them to search, they would get a search warrant. She did explain, however, that she was afraid of her husband. Upon the authority of the signed consent form, Tillman, Baker, Trimble, and Ms. Daniels returned to the apartment. During a search of the apartment, Tillman discovered a briefcase under the bed. Attached was an airline baggage ticket and inside was a 16-gauge shotgun shell.
Detective Baker, during his voir dire testimony, testified to the following:
He and Tillman arrived in Houston at approximately 3 a.m. and reported to the Houston Police Department at approximately 8:30 a.m., where Detective Trimble was assigned to them. The purpose of the trip to Houston was to look for a person named Ron. Although an arrest warrant on the charge of first degree murder had been issued for Tomlin on January 28, the officers had no warrant for Daniels's arrest. (A warrant for Daniels was issued on January 31.)
Thus, the three officers went to Ms. Daniels's apartment looking for Ron. When the three officers arrived at Ms. Daniels's apartment, Baker went toward the back door, so he did not know what transpired between the other two officers and Ms. Daniels at the front door. When he rejoined the officers, they were asking Ms. Daniels if she was alone. At first, she stated that no one else was there, but the officers persisted because she kept looking toward the bedroom. She then explained that her date was there, but that he had nothing to do with this. When Trimble told her to tell him to come out, she asked him if she could have a minute with him and Trimble consented. She went into the back bedroom and reappeared with a man who denied that his name was Ron. He was questioned about his name because he fit the complete description of the Ron identified as being with Tomlin on January 1 and 2, with the exception of about a half inch beard. After producing identification with the name "John Ronald Daniels," the man eventually admitted that people called him Ron. But he denied knowing Phillip or Faye Tomlin. Baker read Daniels his Miranda warnings while at the apartment.
After Daniels was taken to the police station, Baker advised him of his Miranda rights and also advised him that they were investigating a homicide. He gave Daniels a Miranda waiver form and he also read the form aloud. Daniels told him that he could read and that he did not think he needed a lawyer. Baker noted the time on the waiver form as 8:58 p.m., and he called in Trimble, who witnessed Daniels's signature at 9:03 p.m. Baker signed the form at 9:06 p.m. Baker could not remember if Trimble was present during the reading of the Miranda readings, but he did remember that Trimble was present during the waiver. No one threatened or coerced Daniels or offered him any hope of reward in order to obtain his statement. When questioned about his whereabouts on January *Page 648 
1 and 2, Daniels denied any knowledge of the murders, denied being in Mobile at that particular time, and explained that he did not leave his apartment on the first or second, except maybe to go to the store. He also stated that he had been in Mobile approximately six months before when he met Jack Tomlin, Phillip Tomlin's father. The officers' conversation with Daniels lasted, at the most, 15 minutes.
Ms. Daniels was also at the police station; she had consented to accompany the officers and Daniels at Trimble's request. Tillman questioned Ms. Daniels, but Baker was present periodically during the interview. After Ms. Daniels completed her statement and signed it, Tillman asked her if she would sign a consent to search form, to which she replied that she would rather her husband sign it. Tillman then asked her if she would go ahead and sign it. She asked what would happen if she did not sign it. She was told that nothing would happen and that the only thing the officers could do would be to see if they could secure a search warrant. Baker was of the opinion that she wanted to sign the form, but was reluctant because she was "scared to death" of Daniels. Baker was present when Ms. Daniels signed the consent form. He did not threaten or coerce her into signing the form. Pursuant to this form, the Danielses' apartment was searched. In the house, the officers found 16-gauge shells, rifles, guns, pistols, shotguns, and a baggage claim ticket attached to a bag. Ms. Daniels also granted the officers permission to search the vehicle. In the rear trunk, they found a box of expended .44 magnum hulls.
Detective Trimble's testimony, in effect, was as follows:
After Baker and Tillman arrived in Houston, he went with them to Daniels's apartment. When they arrived, Ms. Daniels invited them inside and after they explained why they were there, she said that she would get her husband from the bedroom. After she retrieved her husband, he identified himself as John Daniels, but he stated he was not Ron Daniels and he did not know Tomlin. Trimble placed him under arrest for suspicion of murder and advised him of his rights. Ms. Daniels agreed to accompany them to the police station.
After they arrived at the police station, Trimble was present when Baker and Tillman talked with Daniels. Ms. Daniels was also questioned by Baker and Tillman after her husband's interview. He was also present when Ms. Daniels signed the consent to search and during the search.
On behalf of the defense, Ms. Daniels testified that she received a call from someone who identified himself as a law officer. He explained that he needed to talk with her about a girl with whom she worked. She told him she would talk with him. Thirty minutes to an hour later, three men arrived and asked if they could come inside because they would like to talk about the girl. After she allowed them to enter, they asked if she was alone. At first, she said no one was there, but then an officer said that they were taking whoever was there to jail along with her. She replied that her husband was asleep in the bed. She was then asked if he was Ron and if she would get the person from the bedroom. She asked what they needed to talk with him about and they replied they needed to talk to him about Tomlin's whereabouts. After she woke up her husband and he entered the living room, the officers introduced themselves and asked him if he was Ron. He answered no, so the officers asked to see his driver's license, which he produced. Then, Daniels and his wife were told that the officers were taking them downtown. Ms. Daniels was told that she and her husband were not under arrest, but when she asked if she could telephone her attorney, she was told that she did not need to make any phone calls.
After arriving downtown, Ms. Daniels was questioned about the whereabouts of herself, her husband, and Mr. and Ms. Tomlin on January 1 and 2. She remained at the police station for three or four hours. During this period, she was told that she could call her lawyer later.
After the three officers took her home about midnight, one asked if they could search the house. She was reluctant and *Page 649 
they told her that if they were not allowed to search the house, they would leave someone with her while they obtained a warrant. She then consented. Although she signed the "Voluntary Consent for Search and Seizure," no one read and explained it to her beforehand. While she was down at the jail, she signed four or five papers because she was told she was going to jail if she did not sign them.
Daniels testified on the motions to suppress, as follows: After his wife awakened him, he went into the living room, where one of the three detectives asked him if he knew Tomlin. He answered yes. Then, he was asked if his name was Ron and he replied no. He further explained that he went by the name Ronnie once in a while, but his name is John Daniels. After he gave the officer his driver's license, he was asked several more questions and then told he and his wife had to go downtown. Daniels refused because the officers would not allow him to take his young daughter to a friend's house. When the officers said they would drop her off, Daniels consented to go.
The written consent to search form which was signed by Ms. Daniels was introduced as State's Exhibit 1 and appears in the record as follows:
 "VOLUNTARY CONSENT FOR SEARCH AND SEIZURE
Date January 29, 1977
 I, Mary Louise Daniels, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Ray Trimble and __________, Policemen of the Houston Police Department, to conduct a complete search of my residence located at 1102 West Tri Oak, Spring Branch, Tex. These officers are authorized by me to take from my residence any letters, papers, materials, or other property which they may desire. This written permission is being given by me to the above named officers voluntarily and without threats or promises of any kind and is given with my full and free consent.
 Mary Louise Daniels
(Signed)
 WITNESSES: L.W. Tillman Warren L. Baker, Sr."
 A
In contending that the statements and evidence derived from his allegedly illegal arrest should have been suppressed as "fruits of the poisonous tree," Daniels argues that his warrantless arrest was not authorized by Tex.Crim.Proc. Code Ann. art. 14.01 et seq. (Vernon 1977), which sections impose substantial restrictions on the powers of peace officers to arrest without a warrant. Daniels is correct in his assertion that article 14.04 is the only section by which his warrantless arrest might have been legal. This section provides as follows:
 "Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."
In regard to this statute, the Texas Court of Appeals has observed that "[i]t has been the uniform holding in all cases applying this statute that a showing of 'imminent escape' by the offender is a fundamental requirement if the State is to rely on article 14.04." Bernal v. State,647 S.W.2d 699, 704 (Tex.App. 4 Dist. 1982) (citations omitted).
Daniels's contention of illegal arrest raises two questions: (1) Which state's law determines the legality of Daniels's arrest? (2) If Texas law may properly denominate the legality of the arrest, should the Alabama forum exclude the evidence obtained from this arrest if the arrest is determined to have been in violation of Texas law? Theis,Choice of Law and the Administration of the ExclusionaryRule in Criminal Cases, 44 Tenn.L.Rev. 1043, 1045 (1977). Cf. United States v. Mahoney, *Page 650 712 F.2d 956, 959 (5th Cir. 1983), cert. denied,468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984) (wherein the court noted, "Assuming the threshold proposition that the legality of a state officer's conduct may be measured by state law, a proposition that we do not here decide, it does not follow that state law should govern a federal court's decision whether to admit evidence that is tainted by illegal conduct. . . . We view the inquiry as a distinct inquiry into the utility in a given case of the remedial device of exclusion, a creature of the federal courts") (footnote omitted).
In support of his assertion that this court must look to the law of Texas to determine the validity of his arrest, Daniels cites Tiner v. State, 279 Ala. 126,182 So.2d 859 (1966), and Dickerson v. State,43 Ala. App. 694, 200 So.2d 487, cert. denied, 281 Ala. 718, 200 So.2d 492, cert. denied, 389 U.S. 994,88 S.Ct. 496, 19 L.Ed.2d 489 (1967). In Dickerson, the court, in dicta, after setting forth the appellant's proposition that the validity of his Mississippi arrest should be determined by the decisions of Mississippi, concluded that the arrest was indeed valid under the Mississippi courts' decisions. In Tiner, the court explicitly recognized the cited principle, but in scrutinizing the Florida arrest under Alabama law rather than under Florida law, the court rendered the following explanation:
 "There was no showing as to the Florida laws of arrest. We take judicial notice that such states as Louisiana, Florida, and Texas, are not of common origin with those colonies recognizing the common law as the source of their jurisprudence. Castleman v. Jeffries, 60 Ala. 380; Peet Co. v. Hatcher, 112 Ala. 514, 21 So. 711. We judicially know that Florida was acquired by purchase from Spain in 1819, and will not presume that the common law prevails in Florida in the absence of proof of its adoption. Bank of Cottonwood v. Hood, 227 Ala. 237, 149 So. 676.
 "In such situation it is the doctrine of our cases, in the absence of proof of the law of a sister state not of common origin with Alabama, that the presumption will be indulged that the law of such sister state is the same as the law of Alabama, even our statutory law. Kennebrew v. [Southern] Automatic Electric Shock Machine Co., 106 Ala. 377, 17 So. [545]; Peet Co. v. Hatcher, supra; C.D. Chapman Co. v. Cullifer, 23 Ala. App. 31, 120 So. 297; Bank of Cottonwood v. Hood, supra."
279 Ala. at 133, 182 So.2d at 866. The court accordingly deemed the arrest to be valid under Alabama law and, consequently, the exclusionary rule did not come into play.
In the present case, as in Tiner, there was no showing of the statutes of decisions of Texas. In fact, although Daniels cites and relies in brief on several Texas decisions and the Texas statute, he argued at trial that his arrest was illegal under the law of Alabama. In so arguing, Daniels's counsel stated,
 "Further, I respectfully submit that this issue is governed by Alabama law, regardless of what the Texas law may be because Alabama officers went out there and enlisted the aid of the Texas officers to make this arrest in the manner in which they did it and it's being tried in an Alabama court, Alabama constitutional and statutory law would apply, I am confident that the law would be the same in Texas and any other state since this is a constitutional issue."
(R. 562.) In Williams v. State, 151 Ala. 108,44 So. 57 (1907), our Supreme Court ruled that, where the statutes of another state and that state's supreme court's decisions construing said statutes are not proved and admitted in evidence, the appellate courts are not authorized to consider them. (In so holding, the court cited Code 1896, § 1821 (recodified at § 12-21-94, Code of Alabama 1975), which sets forth the manner of proof of statutes of foreign states.) "Alabama courts do not take judicial notice of the law of a sister state or a foreign country, whether statutory or otherwise." Adair v. State, 53 Ala. App. 251, 254,298 So.2d 671, 674 (1974) (wherein the court concluded that, because the Mississippi search was unlawful under the Fourth Amendment, it did not need to concern *Page 651 
itself with the laws of Alabama and Mississippi or the conflicts of law rule). Thus, under the authority ofTiner, we are required to presume that the law of Texas, decisional and statutory, is the same as the law of Alabama. See also State v. Sparks, 44 Ala. App. 531,215 So.2d 469 (1968); Louisville N.R. Co. v.Outlaw, 36 Ala. App. 278, 283-84, 60 So.2d 367, 372-73
(1951), cert. denied, 257 Ala. 585, 60 So.2d 377
(1952).[6]
In Alabama, an officer is authorized to make a warrantless arrest when a felony has been committed and he has reasonable cause to believe that the person arrested committed it.Beck v. State, 447 So.2d 869 (Ala.Cr.App. 1984),aff'd, 485 So.2d 1207 (Ala. 1985); Ala. Code 1975, § 15-10-3(3). This requirement of reasonable cause has been equated with probable cause. Meeks v. State,434 So.2d 844, 846 (Ala. 1983). In discussing this requirement, the court in Tice v. State,386 So.2d 1180, 1183 (Ala.Cr.App.), cert. denied,386 So.2d 1187 (Ala. 1980), observed the following:
 "The rule of reasonable or probable cause is a 'practical, nontechnical conception.' Brinegar v. United States, 338 U.S. 160, 176 [69 S.Ct. 1302, 1311, 93 L.Ed. 1879] . . . (1949). As defined in Draper v. United States, 358 U.S. 307, 313 [79 S.Ct. 329, 333], 3 L.Ed.2d 327 . . . (1959):
 'Probable cause exists where "the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. . . .' " (Citation omitted.)
The question of probable cause must be determined by an examination of the circumstances surrounding the arrest.Nance v. State, 424 So.2d 1358, 1362 (Ala.Cr.App. 1982).
Although Daniels does not controvert the fact that his arrest was based upon probable cause to believe that he had committed the crime, we independently reviewed the record and concluded that the evidence shows that at the time Daniels was taken into police custody on January 29, the police officers had already talked with the Shanks brothers (on January 27 and 28), who gave the officers accounts of their encounters with Tomlin and Daniels; a description of the man Tomlin introduced to them as Ron; and a description of the guns shown to them. The officers also knew that a .38 revolver and a shotgun had been used during the murders and that a man named Ron sometimes stayed at Mary Daniels's apartment. Finally, during the investigatory conversation at Daniels's apartment, the officers learned that Daniels's middle name is Ronald and they observed that Daniels's appearance coincided with the description given them, with the exception of about a half-inch beard. This knowledge was clearly sufficient for a reasonable man, standing in the shoes of the arresting officer, to believe that Daniels participated in the commission of the murders of the two teenagers. Thus, the warrantless arrest of Daniels was not improper under the law of Alabama.
Because the test of probable cause is the same under the Fourth Amendment as under Alabama law, See, e.g., Beck v.Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142
(1964) (citing Brinegar v. United States,338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)), it naturally follows that Daniels's arrest was also not violative of the Fourth Amendment.[7] Furthermore, *Page 652 
the Fourth Amendment does not require that a warrantless arrest in a public place rest upon the presence of exigent circumstances in addition to probable cause. UnitedStates v. Watson, 423 U.S. 411, 96 S.Ct. 820,46 L.Ed.2d 598 (1976). Although this principle explicitly applies to an arrest in a public place, we view this principle as applying to the facts at hand, since Daniels's arrest was not achieved by forceful entry into Daniels's home, and thus does not fall within the narrow circumstance of Payton v. NewYork, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639
(1980), which requires that police with probable cause seek an arrest warrant if they have time to do so.
Even if Daniels had properly contested his arrest, basing his contest on Texas law, and had introduced such law and, even assuming arguendo, without deciding, that his arrest was indeed illegal under Texas law, it does not follow that the evidentiary fruits of that arrest should not have been introduced at trial. In regard to the determination whether the forum jurisdiction must exclude evidence which has been illegally obtained in violation of another state's law, but which violation is not of constitutional proportions, the following has been observed:
 "What then is the result when the violation [by a nonforum officer] is not of Fourth Amendment dimensions, as in Burge v. State, [443 S.W.2d 720 (Tex.Cr.App. 1969),] where evidence offered in a Texas court was constitutionally obtained in Oklahoma but yet was acquired in violation of the Oklahoma rule that a wife cannot give a consent to search which will be effective against her husband? Courts do not utilize the exclusionary rule in such circumstances, and rightly so; the prospect of deterrence is remote, as is the judicial taint from acceptance of the evidence, and there has been no profit from wrongdoing attributable to the prosecuting jurisdiction."
1 W. LaFave J. Israel, Criminal Procedure § 3.1(e), at 146-47 (1984). Likewise, another commentator has observed:
 "The cases dealing with this . . . situation and its variants are not numerous, but they do reveal a pattern. The courts have had little difficulty in determining that the law of the jurisdiction wherein the conduct took place determines the legality of the conduct. The cases, however, generally refuse to exclude for violations of nonforum law, even when in purely domestic situations the same courts deem the exclusionary device appropriate and effective. Not even the illegality of such conduct under forum law will sway the court to exclude for violations of nonforum law."
Theis, supra, at 1045.
The courts have often reached these conclusions by relying on one of the following conflicts of law theories: (1) The "governmental interest" analysis whereby the forum court looks to the interests behind the laws of the states involved, see, e.g., People v. Orlosky,40 Cal.App.3d 935, 115 Cal.Rptr. 598 (1974); (2) the "substance versus procedure" approach whereby the court recognizes the rule that the law of the forum controls the admission and exclusion of evidence since they are matters of procedure,see, e.g., Burge v. State, 443 S.W.2d 720
(Tex.Crim.App.), cert. denied, 396 U.S. 934, 90 S.Ct. 277,24 L.Ed.2d 233 (1969); and (3) the "significant contacts" analysis whereby the court determines which state has the more significant relationship with the case, see, e.g.,People v. Saiken, 49 Ill.2d 504, 275 N.E.2d 381 (1971),cert. denied, 405 U.S. 1066, 92 S.Ct. 1499,31 L.Ed. 2d 796 (1972). For an in depth discussion *Page 653 
of these theories and the cases cited, see Theis,supra, at 1044-64; Tullis Ludlow,Admissibility of Evidence Seized in Another Jurisdiction:Choice of Law and the Exclusionary Rule, 10 U.S.F.L.Rev. 67, 82-90 (1975). As noted, "[i]t seems . . . that regardless of the approach taken, the courts have shown little inclination to invoke the exclusionary rule in multi-state situations." Theis, supra, at 1064.
Likewise, we conclude, that regardless of the theory employed for analysis, we would not invoke the exclusionary rule to exclude the fruits of Daniels's arrest. If the fruits of the arrest had been unconstitutionally obtained, we would unquestionably reach a different result; but Daniels's arrest clearly passes Fourth Amendment muster. "[T]here is no constitutional barrier, other than the fourth amendment, which precludes one jurisdiction from refusing to honor the standards of another relative to the validity of an arrest or search." People v. Saiken,49 Ill.2d at 509, 275 N.E.2d at 385. Thus, even if we deemed Daniels's arrest to violate the provisions of the Texas Code, the Texas statute exceeds constitutional standards and we would not hold that the fruits of Daniels's arrest should have been excluded.[8]
 B
We also hold that the items obtained during the warrantless search of Daniels's apartment were not erroneously admitted into evidence. This warrantless search falls within one of the well established exceptions to the requirements of both a warrant and probable cause, for it is a search that was conducted pursuant to consent. See Schneckloth v.Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043,36 L.Ed.2d 854 (1973). In order for the consent to be valid, the person giving the consent must have the authority to do so.Stoner v. California, 376 U.S. 483, 84 S.Ct. 889,11 L.Ed.2d 856 (1964). Permission may be obtained from "a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock,415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (footnote omitted). "The authority which justifies the third-party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 171, n. 7, 94 S.Ct. at 993, n. 7. It is clearly the law in Alabama that a wife, or other joint occupants of living quarters, may constitutionally consent to a warrantless search of the premises. See, e.g., Ballardv. State, 461 So.2d 899, 903 (Ala.Cr.App. 1984);Liptroth v. State, 335 So.2d 683 (Ala.Cr.App.),cert. denied, 335 So.2d 688 (Ala.), cert.denied, 429 U.S. 963, 97 S.Ct. 393, 50 L.Ed.2d 332
(1976); Myers v. State, 55 Ala. App. 404,316 So.2d 235 (1975). Moreover, because Ms. Daniels has a right to equal control and equal use of the premises being searched, her authority to consent was not vitiated by the incarceration of her husband. Collins v. State,548 S.W.2d 368 (Tex.Cr.App. 1976), cert. denied,430 U.S. 959, 97 S.Ct. 1611, 51 L.Ed.2d 811 (1977). Furthermore, the police are under no obligation to determine whether the absent spouse objects to the search. 1 W. LaFave J. Israel,supra, at 352. We conclude that Ms. Daniels had authority to waive the requirement of a search warrant and consent to a search of the premises.
In addition to proving that the person consenting had the authority to do so, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a *Page 654 
search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. NorthCarolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791,20 L.Ed.2d 797 (1968) (footnote omitted). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte,412 U.S. at 227, 93 S.Ct. at 2047. When the evidence pertaining to the voluntariness of the consent is conflicting, the trial court is in the best position to determine consent or the lack thereof. Liptroth v. State, 335 So.2d at 688;Holmes v. State, 342 So.2d 28, 33 (Ala.Cr.App. 1976), cert. denied, 342 So.2d 36 (Ala. 1977). On appeal, this court will not disturb the trial court's finding unless we are convinced that the conclusion is palpably contrary to the weight of the evidence. Coots v.State, 434 So.2d 864, 867 (Ala.Cr.App. 1983).
From the evidence adduced at the voir dire hearings, we conclude that the trial court was correct in finding that the State clearly and convincingly proved that Ms. Daniels's consent was free and voluntary. The only evidence to the contrary was Ms. Daniels's testimony. The issue was therefore one of credibility which the trial court, who saw and heard the witnesses, resolved in favor of the police officers. "The trial judge was in a better position to resolve this conflict in the evidence and determine the facts surrounding the search and his determination will not be disturbed on this appeal." Smith v. State, 466 So.2d 1026, 1029
(Ala.Cr.App. 1985).
The evidence presented by the officers established the following: Ms. Daniels signed a written consent form; she was not coerced by any act of force or threat of force; she was not enticed by any promise of benefit; and she had been informed of her Miranda rights. In addition, there was no evidence that she was mentally deficient or that the consent was obtained by deceit or trickery. Moreover, the fact that she was within the confines of the police station when she gave her consent is not enough to demonstrate coerced consent, since she was there by her own volition.See United States v. Mendanhall 446 U.S. 544,100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). See also United Statesv. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 828,46 L.Ed.2d 598 (1976) (wherein the Court, in extending theSchneckloth rule to a case in which consent was obtained from a person constitutionally in police custody, stated, "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search"). Furthermore, her declaration to the officers that she would rather her husband sign the written release indicates that she knew she was being asked, rather than ordered, to permit the search and that she had a right to refuse permission. Cf. United States v. Morrow,731 F.2d 233, 236 (4th Cir.), cert. denied,467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984). (Although this latter knowledge is a factor in determining voluntariness, it is not a requirement.) Schneckloth v. Bustamonte,412 U.S. at 249, 93 S.Ct. 2059.
Finally, the voluntariness of Ms. Daniels's consent was not obviated by the fact that she was told, upon her inquiry as to what would happen if she did not sign the consent form, that nothing would happen, but that the officers would see if they could secure a search warrant. We find persuasive the following holding by the United States Court of Appeals for the Fifth Circuit in United States v. Savage,459 F.2d 60, 61 (5th Cir. 1972), cert. denied,415 U.S. 949, 94 S.Ct. 1470, 39 L.Ed.2d 564 (1974):
 "The consent was not rendered involuntary by reason of the fact that before signing the form the defendant asked the police officer if the officer could get a search warrant and the officer replied 'Yes, we probably can.' The officer's statement was in response to defendant's inquiry, and it was not a misrepresentation of the facts."
See also United States v. Calvente, 722 F.2d 1019,1023 (2d Cir. 1983), cert. denied, 471 U.S. 1021,105 S.Ct. 2030, 85 L.Ed.2d 313 (1985); United States v.Lace, *Page 655 669 F.2d 46, 52 (2d Cir.), cert. denied, 459 U.S. 854,103 S.Ct. 121, 74 L.Ed.2d 106 (1982), and cases cited therein. We find that the advice rendered does not cast this case into the realm of cases wherein the reviewing court has declared the consent involuntary because it was obtained by an officer's representation that he will obtain a search warrant where, in fact, no probable cause exists. E.g., Whitenerv. State, 390 So.2d 1136 (Ala.Cr.App.), cert.denied, 390 So.2d 1145 (Ala. 1980).
In addition to holding that the fruits of the search were not the product of an involuntary consent, we also hold that they were not the product of consent tainted by the alleged illegal arrest of Ms. Daniels. The question whether Ms. Daniels' "consent to accompany the [officers] was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances, Schneckloth v. Bustamonte,412 U.S., at 227 [93 S.Ct. at 2047], and is a matter which the Government has the burden of proving. Id., at 222 [93 S.Ct. 2045] . . . ." United States v.Mendenhall, 446 U.S. at 557, 100 S.Ct. at 1878. We conclude that on the facts of this case, no impermissible seizure of Ms. Daniels occurred, for our examination of the evidence reveals that Ms. Daniels went voluntarily with the officers to the police station.
 VII
Daniels challenges the sufficiency of the trial court's oral charge to the jury for the court's failure to instruct on the elements of willfulness, maliciousness, premeditation, and deliberation. In Tomlin v. State, 443 So.2d 59,64 (Ala. 1983), cert. denied, 466 U.S. 954,104 S.Ct. 2160, 80 L.Ed.2d 545 (1984), our Supreme Court treated this issue with regard to Daniels's co-defendant, as follows:
 "The oral charge must be judged within the context of the facts in dispute. Van Antwerp v. State, 358 So.2d 782, 786 (Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978). There was no dispute as to whether the killings were premeditated, unlawful, and done with malice aforethought. Tomlin either carried out the brutal, execution-style killings after months of planning or he was in Texas at the time of the killings and had no knowledge of them. There was no evidence to suggest accident, passion, justification, or provocation."
Likewise, Daniels was either guilty of the offense charged or he was in Texas; the crime was proven without conflict to be capital murder. Although the issue in Tomlin was reviewed by the "plain error" standard pursuant to A.R.A.P. 45A and, in the instant case, Daniels objected to the trial court's omission, we find the court's holding inTomlin to be controlling.
 VIII
Although Daniels does not contest the propriety of the trial court's written findings of fact pursuant to § 13-11-4, upon our review, we find the order inadequate for the following reasons. First, it does not contain a statement of the "findings of fact from the trial" as required by § 13-11-4. Secondly, the court did not enter proper written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13-11-6. Essentially, the same errors were present in co-defendant Tomlin's sentencing order; thus, we direct the trial court to our instructions in Tomlin, 443 So.2d at 58-59.[9]
Thirdly, in regard to the specific findings *Page 656 
concerning the presence or negation of the enumerated mitigating circumstances, we note that the court made no specific finding as to § 13-11-7(7) and that the court failed to determine whether Daniels had asignificant history of prior criminal activity, even though the court concluded that Daniels did not have a "long history." In addition, in regard to the determination of § 13-11-7(4), we direct the court's attention to our Supreme Court's observations in Tomlin, 443 So.2d at 64.
After searching the record, pursuant to A.R.A.P. 45A, and considering the alleged errors asserted on appeal, we conclude that Daniels received a fair trial. However, due to the deficiencies in the sentencing order, we remand this cause to the trial court with directions that the court correct its sentencing order in accordance with our observations and, once again, decide the appropriate punishment by reweighing the proper aggravating circumstances against the proper mitigating circumstances. The court's new sentencing order should be promptly transmitted to this court.
REMANDED WITH DIRECTIONS.
All Judges concur.
[1] Daniels's co-defendant, Phillip Wayne Tomlin, was also convicted of murder in the first degree wherein two or more persons were intentionally killed. In addition, he was convicted of murder for hire. On appeal, this court affirmed Tomlin's conviction; however, we remanded the cause for further sentencing proceedings. Tomlin v. State,443 So.2d 47 (Ala.Cr.App. 1979). These actions were affirmed by our Supreme Court. Tomlin v. State, 443 So.2d 59
(Ala. 1983), cert. denied, 466 U.S. 954,104 S.Ct. 2160, 80 L.Ed.2d 545 (1984). On return to remand, Tomlin's sentence of death was affirmed. Tomlin v. State,516 So.2d 790 (Ala.Cr.App. 1986).
[2] After the prosecution rested, two counts were stricken from the three-count indictment upon which Daniels was originally charged. Thus, we need only address Daniels's contentions in regard to the remaining count, Count I.Jackson v. State, 516 So.2d 726 (Ala.Cr.App. 1985).
[3] Substantial confusion has emerged from the two separate but related terms of "aggravation" and "aggravating circumstances" as used in the 1975 Act. Dobard v.State, 435 So.2d 1338, 1348 (Ala.Cr.App. 1982),aff'd, 435 So.2d 1351 (Ala. 1983), cert.denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203
(1984). The aggravation elevates a non-capital offense to a capital offense as set out in § 13-11-2; the aggravating circumstances are listed in § 13-11-6 and are relevant only to the sentencing of one convicted of a capital offense described in § 13-11-2. Id.; Kyzer v. State,399 So.2d 330, 338 (Ala. 1981). Thus, the technically correct term to use in discussing the instant issue is "aggravation."
[4] Ala. Code 1975 does not repeal "statutes in effect on the effective date of this Code which apply to one or more judicial circuits . . . [on] the basis of population. . . ." Ala. Code § 1-1-10 (1975).
[5] In the instant case, the record contains no indication that the court considered the jury's "sentence" in sentencing Daniels to death. In reviewing the trial court's statements made during the trial proceedings after the jury rendered its verdict and during the sentencing hearing, we find apropos the following: "None of these statements indicates that the judge considered the jury's verdict to be a factor that he added, or that he was required to add, to the scale in determining the appropriateness of the death penalty, or that he believed the jury's verdict was entitled to a presumption of correctness." Baldwin, 472 U.S. at 385,105 S.Ct. at 2735. We instruct the trial court on remand to continue to refuse to give deference to the jury's "sentence."
[6] In so holding, we are aware that, as to civil proceedings, A.R.Civ.P. 44.1 has abrogated the prior law requiring matters of foreign law to be pleaded and proven as facts, for the Rule provides that issues of foreign law are to be determined as questions of law. Rayburn v.State, 366 So.2d 708 (Ala. 1979) (review of habeas corpus proceedings); Goodman v. Director of the Dept. ofPublic Safety, 332 So.2d 396 (Ala.Civ.App. 1976). However, the Rules of Civil Procedure have no application in criminal proceedings. King v. State, 349 So.2d 620
(Ala.Cr.App.), cert. denied, 349 So.2d 621 (Ala.),cert. denied, 434 U.S. 968, 98 S.Ct. 513,54 L.Ed.2d 455 (1977).
[7] Although the matter was not raised by Daniels, we also find that Daniels's warrantless arrest did not contravene the principles of Payton v. New York, 445 U.S. 573,100 S.Ct., 63 L.ED.2d 639 (1980):
 " 'Payton, did not purport to decide, . . . whether an initial consensual entry would justify a subsequent warrantless arrest.' United States v. White, 660 F.2d 1178, 1182-83 (7th Cir. 1981) (upholding warrantless entry into defendant's apartment based on deceitfully obtained consent when entry served investigative purposes). See also United States v. Ruiz-Altschiller, 694 F.2d 1104 (8th Cir. 1982), cert. denied, Perry v. United States, 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1371 (1983)."
Johnson v. State, 453 So.2d 1323, 1325 (Ala.Cr.App. 1984). We conclude, after reviewing the testimony of all those involved, that the officers made a warrantless butconsensual entry into Daniels's apartment.
[8] Even the Texas courts have rejected the proposal that a confession is inadmissible if it is obtained during detention resulting from an arrest unlawful under Texas law. Dawson,State — Created Exclusionary Rules in Search and Seizure:A Study of the Texas Experience, 59 Tex.L.Rev. 191, 234 (1981). See, e.g., Welcome v. State, 635 S.W.2d 828
(Tex.Ct.App. 1982) (wherein the court held that, even though the defendant's arrest violated art. 14.03 and art. 14.04, the defendant's subsequent confession was admissible since the officers had probable cause for the detention and, thus, the arrest did not violate the Fourth Amendment).
[9] We note one correction to the Tomlin
instructions. In Tomlin, 443 So.2d at 58, the court instructed the lower court that the fact " 'the Capital Felony was committed while the Defendant was engaged in the commission of a double homicide in violation of Title (sic) 13-11-10,' is not an aggravating circumstance within § 13-11-6." This instruction preceded Kyzer v. State,399 So.2d 330 (Ala. 1981), wherein our Supreme Court ruled that the aggravation averred in the indictment can be considered at sentencing as a separate aggravating circumstance. Therefore, in the present case, the trial court is authorized to find the aggravation averred in the indictment as an aggravating circumstance although it is not listed in § 13-11-6 as an aggravating circumstance. Although the present crime occurred prior to Kyzer, application of Kyzer is not prohibited by the constitutional ban on ex post facto laws. Kennedy v.State, 472 So.2d 1106 (Ala.), cert. denied,474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).